[No. D017859. Fourth Dist., Div. One. Sept. 13, 1993.]

CHARLES WASHINGTON et al., Plaintiffs and Appellants, v.
BOARD OF SUPERVISORS OF SAN DIEGO COUNTY et al.,
Defendants and Respondents.

## COUNSEL

Rosemary Bishop, Carol Ratsamy Bracy, Anson B. Levitan, Gregory E. Knoll, Robert D. Newman and Richard A. Rothschild for Plaintiffs and Appellants.

Lloyd M. Harmon, Jr., County Counsel, Diane Bardsley, Chief Deputy County Counsel, Ian Fan and Theresa Osterman Stevenson, Deputy County Counsel, for Defendants and Respondents.

## OPINION

**THE COURT[1]**—In January 1992 the San Diego County Board of Supervisors enacted an ordinance (San Diego County Admin. Code, § 257.2) directed to the eligibility for general relief benefits of employable single claimants. Benefits payable to eligible recipients prior to the enactment of the ordinance were not time-limited. The ordinance changed eligibility by providing that "[o]therwise eligible employable recipients shall become ineligible to receive General Relief benefits after receiving three months of benefits within any twelve-month period."

The Legal Aid Society of San Diego, representing several specific beneficiaries of the general relief program, promptly brought an action seeking a

---

[1]Before Wiener, Acting P. J., Froehlich, J., and Nares, J.

declaration of invalidity of the ordinance. In due course the action was certified as a class action for the benefit of all persons who would have their general relief benefits limited under the ordinance.

The superior court issued a temporary restraining order precluding the county from implementing the ordinance, but after the order to show cause hearing declined to issue a preliminary injunction, concluding that the plaintiffs probably would not prevail on the merits. Writ proceedings were then initiated, the effectiveness of the ordinance being stayed pending writ disposition. This court, on March 17, 1992, issued a nonpublished opinion in which we recognized that the precedent established in *Mooney* v. *Pickett* (1971) 4 Cal.3d 669 [94 Cal.Rptr. 279, 483 P.2d 1231] suggested that the plaintiffs probably *would* prevail, and concluded that the harm to the relief recipients, who would be made destitute by the operation of the ordinance, outweighed the temporary fiscal detriment to be incurred by the county. We therefore ordered the restraint on implementation of the ordinance to be continued until trial of the action. Commenting upon the difficulty the county faced in upholding the ordinance, we remarked that "[t]he Board's ability to distinguish *Mooney* depends . . . upon a strong showing of change of fundamental circumstances which would cause *Mooney* to be distinguishable. *Mooney* rests, at least arguably, upon the premise that 'the county can surely find many ways which do not violate state statute in which it can limit General Assistance payments to the financial resources available' [citing *Mooney* at p. 680]."

Trial before the Honorable Judith L. Haller, sitting without jury, commenced in August 1992. The court's statement of decision was finalized on October 28, 1992. The court concluded that the ordinance was lawful because of the extraordinary fiscal crisis facing the county. We elected to treat the prompt writ petition brought from this ruling as an expedited appeal, and continued the stay of enforcement. Recognizing the fiscal crisis imposed upon the county, we have endeavored to finalize our decision with dispatch. The difficulty of the issue, however, which required postargument briefing, has to some extent thwarted our efforts to arrive at an early decision.

### FORMAT FOR DELIBERATIONS

An abridged overview of the positions taken by the parties on appeal is as follows: Plaintiffs argue that the obligation to provide general relief to indigent poor is created by state statute. Counties are delegated the burden of carrying out the state mandate as agents of the state. Numerous court decisions, of which the *Mooney* decision is preeminent, have emphasized

that counties have no discretion but to carry out the state mandate, and that fiscal difficulty is no defense. If forced to accept the possibility that "impossibility" of performance because of lack of funds might be a defense, the plaintiffs point to the fact that impossibility in this case has not been demonstrated. Plaintiffs' position is that in order to assert the defense of impossibility, the county is obliged to show that funding for *all* county discretionary programs has been terminated before funding for the general relief program, a "mandatory" state program, can be impaired.

The county, on the other hand, focuses on the statement in *Mooney* to the effect that the county "can surely find . . . ways . . . in which it can limit General Assistance payments to the financial resources available." The financial status of counties has changed dramatically, it is pointed out, since 1971 when *Mooney* was decided. If funding of the general relief program is to be continued without reduction, other programs of equal or greater public importance must be cut. While not creating a situation of classic "impossibility," the county argues, the present status of fiscal affairs is one which realistically does not meet *Mooney*'s assumption that there would be ways to support the program through "financial resources available."

We have concluded that it is not necessary for us to address the issue which has been posed and argued at length by the parties. That issue might be phrased: "When a county can establish extreme financial difficulty which requires the diminished spending on virtually all its programs, does the county have discretion to impose reduction of expenditures on so-called state-mandated programs, such as the general relief program?" Were we to accept the proposition that the answer to this question could be "yes" under certain circumstances,[2] we would nevertheless reverse the trial court's decision in this case. ■ Assuming, but again not deciding, that the county has discretion under some circumstance to fail in complete fulfillment of the state welfare mandate, the county's effort as reflected by this ordinance must fail.

The reason for this conclusion is that the county by this ordinance has not simply shorted its payment obligation, as might be reflective of possible

---

[2]We hasten to caution that one reason for this brief "*per curiam*" opinion is that we have elected *not* to attempt resolution of this issue. We therefore affirmatively do not determine whether there is sufficient evidence to support the trial court's finding of severe financial crisis, nor do we address the trial court's conclusion that there are other programs as important or more important than the general welfare program, resulting in its determination that cuts in the welfare program are warranted. The panel has concluded that it is not necessary to a resolution of this case to broach these issues, and that their determination is best left to future inquiry which may be based upon a county ordinance with more effective focus on the issue.

impossibility of compliance. The county has instead attempted redefinition of specific eligibility criteria. The county has determined to exclude a specific segment of welfare beneficiaries, making a value judgment that single employable persons are less deserving of support than other indigent individuals. The county has also determined that it is reasonable to put a cap on benefits for this class of recipients after they are paid for three months in any twelve-month period.

The county cannot reduce benefits in this fashion. The statute mandating general relief requires that it be made available to "all incompetent, poor, indigent persons. . . ." (Welf. & Inst. Code,[3] § 17000.) Again and again our courts have voided county ordinances which have attempted to redefine eligibility standards set by state statute. ■ When the County of San Francisco attempted to exclude employable single men from relief assistance, the Supreme Court struck down the action, stating: "When a statute confers upon a state agency the authority to adopt regulations to implement, interpret, make specific or otherwise carry out its provisions, the agency's regulations must be consistent, not in conflict with the statute. . . ." (*Mooney* v. *Pickett, supra,* 4 Cal.3d at p. 679.) This result was in harmony with an earlier Court of Appeal decision which struck down a county regulation excluding alcoholics from welfare aid, finding the local regulation in conflict with state law and hence invalid under Government Code former section 11374. (*Rosas* v. *Montgomery* (1970) 10 Cal.App.3d 77, 92 [88 Cal.Rptr. 907, 43 A.L.R.3d 537].) An Alameda County ordinance attempted to deny relief benefits to adults under the age of 21 (after the state had lowered the age of majority to 18). Stressing that the statute imposed a duty to support *all* indigent persons, the reviewing court held that ". . . the ordinance and regulations are invalid because they are in conflict with the statutes of this state which control eligibility for General Assistance payments." (*Bernhardt* v. *Board of Supervisors* (1976) 58 Cal.App.3d 806, 808 [130 Cal.Rptr. 189].) Our court in *Nelson* v. *Board of Supervisors* (1987) 190 Cal.App.3d 25 [235 Cal.Rptr. 305] struck down an ordinance which would have denied benefits to individuals without residence addresses, stating that when a county adopts regulations implementing a state statute " ' ". . . the agency's regulations must be consistent, not in conflict with the statute . . . ." ' " (*Id.* at pp. 29, 30, quoting *City and County of San Francisco* v. *Superior Court* (1976) 57 Cal.App.3d 44, 49 [128 Cal.Rptr. 712].)

■ To summarize, the county in its efforts to reduce expenditures for general relief has not approached the problem in a manner which might reflect financial impossibility of compliance. It has instead sought to reduce

---

[3] All statutory references are to the Welfare and Institutions Code unless otherwise specified.

its expenditures by redefining the people who will be eligible for benefits, and the redefinition was clearly contrary to then existing state requirements.[4] While a county in financial extremes may not be required to commit economic suicide in vain attempts to fund all programs fully, it may not meet its financial burdens by redefining state standards of eligibility. That is what the county has attempted to do in this case, and its effort in terms of San Diego County Administrative Code section 257.2 is invalid.

### DISPOSITION

The judgment is reversed with instructions to enter judgment for the plaintiffs. Costs on appeal are awarded to plaintiffs.

**FROEHLICH, J.,** Concurring.—The *per curiam* opinion issued in this case is indisputably correct, in my opinion. It fails, however, to address the issue the parties apparently conceived to be central to the case. This issue is whether the county under any circumstance can short its obligations to the general welfare program when it is in financial extremes. It is proper and in keeping with judicial restraint that we avoid unnecessary rulings, that we limit our appellate conclusions to those necessary to resolve the case, and that we not attempt resolution of issues which are potential but not currently actual. (See Witkin, Manual on Appellate Court Opinions (1977) § 86, pp. 155-157.)

However, our brief opinion, although written with care to avoid an inferential ruling on the issue so strenuously argued, may nevertheless be taken by some as a complete rejection by this court of the entirety of the county's position. This is not the case so far as I am concerned, and I write this concurring opinion to more fully explain my position.

[4]The Legislature in September 1992 adopted amendments to section 17001.5, which specifically addressed the conditions upon which a county could suspend benefits to employable indigent recipients. The new amendment is clearly in conflict with the standards set by the county ordinance. While our review of the superior court's judgment would normally be limited to the record before the court (which would not include a statute enacted *after* the ordinance in question), it would be appropriate for us to consider the fact that subsequent events had made the issue before us moot. (See 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 253, pp. 259, 260, and § 522, p. 504; *O'Neal* v. *Seabury* (1938) 24 Cal.App.2d 308, 311 [74 P.2d 1082].) We could, therefore, have issued a brief opinion pointing out the new statute, declaring that obviously the guidelines for terminating relief contained in the new statute preempt those previously set forth in the ordinance, and dismissing the appeal as moot.

Additionally the Legislature very recently adopted new section 17000.6, which creates an administrative avenue for possible reduction of the level of welfare benefits. (Stats. 1993, ch. 72, § 1.) As with the amendments to section 17001.5, mentioned above, this new provision postdates the issues before the trial court in this case, and hence technically is not relevant. In any event, since the ordinance in question is so clearly contrary to state eligibility standards, we elect to resolve the case on this ground without regard to the subsequent legislation.

An effort to focus more precisely on the county's position requires that I lay as a foundation the factual and legal setting of the case. Were we to conclude as a matter of law that no circumstance of financial extremity could justify the reduction of general welfare payments, then the facts found by the trial court would be irrelevant. In my opinion this conclusion of law cannot be reached, and I therefore must pay attention to the facts.

The reviewing court is bound by the facts found by the trial court, assuming the findings are supported by substantial evidence. Applying that principle to this case is not difficult, because the facts brought before the trial court were largely undisputed.[1] While plaintiffs disagree with the court's legal conclusions, they do not take issue with the assertion that there is evidence to support all of the court's factual determinations. My review of the record confirms the conclusion that the court's findings reflect and are supported by the evidence brought before it. I therefore accept the findings, which are summarized as follows (quoted portions being from the trial court's statement of decision):

1.   The court recited detailed statistics which describe the number, gender, racial makeup and other characteristics of employable single people receiving general relief. One-third of the total category of recipients receive benefits for periods longer than three months, and hence would be affected by the new ordinance. A significant number of the recipients will find work within three months, but probably more than half will not. Of those who find work only 10 to 20 percent will retain their jobs for nine months or more. Recipients who lose benefits because of the new ordinance will not all be able to find support from other community resources, and some will have to depend upon family, friends, or will become homeless.

2.   Our present system of welfare benefits has created a "cycle of . . . dependency" which is detrimental both to the individual recipients and to the public. The new ordinance will have the effect of motivating recipients to find work and will reduce dependency upon welfare.

3.   The 1991-1992 budget reflected a deficit of from $30 million to $45 million. In response to this crisis the county implemented budgetary cuts which included hiring freezes, voluntary time-off (VTO) programs for employees, cuts in travel budgets, freezes in one-time expenditures, and program cuts. The 1992-1993 budget is $19 million less than the expenditure for

[1]Plaintiffs recite in their brief that "[t]o a large extent, the evidence introduced at trial by both sides concerning the County's fiscal condition was undisputed." Plaintiffs refer to the court's findings concerning the fiscal deficit, the effort to increase revenues and the savings instituted in several areas, and state "[f]or purposes of this appeal, plaintiffs do not dispute these findings."

the previous fiscal year. The balancing of this budget required cuts in *all* programs except those of the sheriff and the courts. Some 70 percent of county program costs are covered by program revenues (state and federal sources, grants, and specific fees and charges). The balance of approximately 30 percent comes from "general purpose revenues," made up of property taxes, sales taxes, vehicle license fees, court fines and other miscellaneous sources. If one assumes that the county has no discretion with respect to the use of funds for so-called "mandatory" programs, only approximately 1.6 percent of total revenues remain available for so-called "discretionary" programs.

4. Restrictions on county sources of revenue, imposed by Proposition 13 and Assembly Bill No. 8, have precluded the county from raising sufficient funds to support its necessary programs. The gap between available funds and demand thereon has forced the county to make painful fiscal decisions. Priorities have been set "in all areas of public funding from health services to police protection to social services to criminal justice. . . ." Numerous money-saving devices have been implemented, such as the hiring freezes and VTO programs mentioned above. New user fees of various kinds have been inaugurated. A lawsuit has been instituted to challenge the allegedly inequitable allocation of Assembly Bill No. 8 allocations from the state.

5. Implementation of the subject ordinance would save the county $3.5 million to $3.9 million in 1992-1993. While this is not a major percentage of total county expenditures (actually, less than 1 percent thereof) it is a significant amount when considered in light of the discretionary funding available to the county. Failure to implement the ordinance will require reduced expenditures of other programs. The programs which would suffer are of critical importance to the overall health, safety and welfare of the county. It is not realistic or reasonable to argue that replacement revenues can be generated from other sources.

Based upon these factual findings, the court concluded that the county had met its burden of establishing fiscal impossibility, defining fiscal impossibility as a concept "premised on reasonableness: money must be available from other sources without violating the law or causing substantial harm to programs of equal importance and significance to the overall health, welfare, and safety of this county and its residents." It was upon this ultimate conclusion of law that the trial court found the ordinance valid.

These factual findings indicate that the county has no alternative but to reduce funding for most if not all of its programs. Is there then something about the general welfare program which makes it sacrosanct? Discussions

of this subject tend to characterize programs administered by the county as "mandatory" or "discretionary" without much analysis as to the source of the characterization or its practical results. Fortunately, at the trial below uncontradicted evidence was received which explained the differences in the various county administered programs and the practical effects of their funding sources.[2]

The programs can be divided generally into four groups: The first is "Mandated Program with Mandated Service Level." This is a program the maintenance of which is required either by federal or state law, and the service level of which is also prescribed by federal or state law. An example would be the provision of indigent criminal defense. The second category is "Mandated Program with Discretionary Service Level." An example would be the administration of the sheriff's office and the jails, which is required by state law but with respect to which no specific level of service is prescribed. The third category is the "Discretionary Program with Mandated Service Level." This is a program the county is not required to provide but if it elects to participate (and accepts state or federal funds for the program) must fund at a prescribed level. An example would be alcohol and drug programs. The final category is "Discretionary Program with Discretionary Service Level." As the name implies, such program is one which the county is not required to but elects to sponsor, and the level at which it is funded is discretionary. An example would be the maintenance of honor camps. Of course, as the witnesses explained, these categories are not always clearly defined, and a reduction in a supposedly "discretionary" program may cause an impact upon a supposedly "mandated" program. For instance, if the county elects to terminate its honor camp programs (discretionary/discretionary) the result will be crowding of the jails with financial impact upon the sheriff's programs (mandatory/discretionary).

My review of the manifold programs administered by the county (as reflected in voluminous documentation presented to the trial court in this case) casts doubt upon the facile labeling of a program as either "mandatory" or "discretionary" (or "local" as distinguished from "state"). It may well be that completely "discretionary" programs should be given a lower budgetary priority simply because neither state nor federal law requires their administration.[3] This dichotomy leaves unprioritized, however, the many programs which are either "mandatory/mandatory" or "mandatory/discretionary." I

[2]This was given by Roger John Mialocq, who qualified as an expert in the preparation of budget analyses for cities and counties; and Manuel Anthony Lopez, an administrator who had supervised the preparation of a "full cost revenue based study" of the county budget for fiscal year 1990-1991.

[3]Even this assumption weakens, however, when the particular programs are considered. We find from the County of San Diego Full Cost Revenue Based Study that this category includes

accept the proposition that the general relief program is a state-mandated program at state-mandated service levels. Does this mean, therefore, that it is a program of higher priority than the many programs mandated by the state but at service levels which are, at least definitionally, discretionary? A brief and by no means exhaustive listing of these programs would include: public health responsibilities imposed on counties by Health and Safety Code section 450 et seq.; basic due process protection which the county must provide criminal accuseds by California Constitution, article I, section 15; the requirement of Welfare and Institutions Code section 202, subdivision (b) that the county provide minors in its custody with "care, treatment and guidance consistent with their best interest[s]"; the obligation imposed by Streets and Highways Code section 941 that the county create and maintain highways "necessary to public convenience."

Plaintiffs argue that the general relief program is somehow more important, and should be given higher priority in the allocation of funds, than other programs imposed upon the county by state law, focusing upon the distinction that at least some of these other programs do not have state-mandated funding levels. I find this argument difficult to accept, and offer as an example the matter of public safety. California Constitution, article I, section 1, establishes the right to "pursu[e] and obtain[] safety." To enforce this right the Legislature has commanded since 1883 that the law enforcement officials of each county shall "arrest" all persons who commit a public offense, and shall prevent "affrays, breaches of the peace, riots and insurrections which may come to [their] knowledge." (Stats. 1883, ch. LXXV, § 93, p. 320, now codified as Gov. Code, §§ 26601 and 26602.) Implementing these constitutional and statutory imperatives are Government Code sections 26600, 26601, and 26605, which require that each county have a sheriff and that the sheriff shall "preserve the peace," "arrest . . . all persons who attempt to commit or who have committed a public offense" and "take charge of and keep the county jail and the prisoners in it." Since the mandate to support a sheriff's office and to keep the peace contains no specified level of service or funding, this is a "mandatory/discretionary" program.

Welfare and Institutions Code section 17000 requires that "[e]very county . . . shall relieve and support all incompetent, poor, indigent persons . . . ." Section 17001 of that code requires counties to adopt standards of aid and care which will carry out the broad requirement of section 17000, and case law has established that the level of funding must be sufficient to cover basic

---

such seemingly important public services as pest control, the county human relations commission, the office of the county counsel, the county library, various county health programs, the administration of the municipal court, adult and youth honor camps, the department of public works, and many other seemingly essential services.

requirements of food, shelter, clothing, transportation and medical care. (*Boehm* v. *Superior Court* (1986) 178 Cal.App.3d 494, 501 [223 Cal.Rptr. 716].) The general relief requirement is, therefore, a "mandatory/mandatory" program. Have we, by giving the program this label, elevated it in priority to a position of superiority, deserving priority in funding, as compared to other state-mandated programs, such as the sheriff's department? I can find no authority in support of this proposition.

There is, of course, considerable authority to the effect that a county, as agent of the state, has no discretion other than to carry out state programs. The cases enunciating this black-letter statement in general do not, however, consider the possibility that a county *cannot* fund the program under consideration by the court without shorting another equally important, or indeed more important, public program. In *City and County of San Francisco* v. *Superior Court* (1976) 57 Cal.App.3d 44 [128 Cal.Rptr. 712], for instance, after finding that San Francisco's indigent funding level was "arbitrarily low," a superior court ordered the social services commission to investigate and establish adequate standards. As part of an opinion upholding this order, the appellate court stated that the duty of relief and support for indigents was mandatory, and that ". . . the excuse that [the county] cannot afford to do so is unavailing." (*Id.* at p. 47.) This was apparently a gratuitous comment, however, since it seems the county did not interpose a defense of financial inability to increase payments. This phrase was again quoted in *Poverty Resistance Center* v. *Hart* (1989) 213 Cal.App.3d 295, 303 [261 Cal.Rptr. 545]. The *Hart* case, however, dealt with the factors used by the county in establishing its level of relief, and did not consider a county claim of inability to finance the program.

The controlling authority, of course, insofar as it speaks to the issue, is *Mooney* v. *Pickett* (1971) 4 Cal.3d 669 [94 Cal.Rptr. 279, 483 P.2d 1231] The Supreme Court there dealt with San Mateo County's attempt to limit relief payments somewhat similar in nature to that attempted by our San Diego County ordinance, the only difference being that the San Mateo ordinance under consideration precluded *all* assistance to "employable single men." (*Mooney, supra*, at p. 671.) The *Mooney* court recited the familiar teaching that the county is but an agent of the state in carrying out the provisions for general relief, and that it is precluded from denying relief to individuals the state has identified as qualified. The court in *Mooney* was also faced with an argument of fiscal impossibility. This argument was refuted by the following oft-quoted passage: "Finally, respondents contend that the county simply cannot afford to extend General Assistance to employable persons; they present an estimate that abolition of the employable single man rule would approximately double the cost of General Assistance.

We are aware of the financial difficulties which attend present welfare programs on local, state, and national levels. This court, however, is not fitted to write a new welfare law for the State of California, and while the Legislature addresses itself to that task it remains our task to enforce the existing law. We observe that the county retains extensive authority to establish standards for General Assistance, both as to eligibility and as to amount of aid. In view of this discretion, the county can surely find many ways which do not violate state statute in which it can limit General Assistance payments to the financial resources available." (*Mooney, supra,* at p. 680.)

Two assumptions are made in this broad statement of county responsibility which can be called in question at the present time. The first is that ". . . the county retains extensive authority to establish standards for General Assistance, both as to eligibility and as to amount of aid." Since 1971 the judiciary has sharply delineated counties' discretion. In *Bernhardt* v. *Board of Supervisors* (1976) 58 Cal.App.3d 806, 812 [130 Cal.Rptr. 189] it was determined that assistance could not be denied to young adults. *Long* v. *City and County of San Francisco* (1978) 78 Cal.App.3d 61, 69 [144 Cal.Rptr. 64] held that the availability of food stamps could not be taken into consideration in setting assistance levels. *Robbins* v. *Superior Court* (1985) 38 Cal.3d 199, 210 [211 Cal.Rptr. 398, 695 P.2d 695] determined that counties may not require recipients to accept "in-kind" benefits because such results in a loss of privacy. In *Boehm* v. *Superior Court, supra,* 178 Cal.App.3d at pages 501-504, it was held that in setting assistance levels the county may not limit its consideration to only the basics of food and housing, but must include an appropriate allowance for each of the necessities of life, which include clothing, transportation and medical care. On the other hand, it was held in *Nelson* v. *Board of Supervisors* (1987) 190 Cal.App.3d 25, 34 [235 Cal.Rptr. 305] that a recipient of relief (including an allowance for housing) could not be denied benefits on the ground of lack of a residence address. In *Poverty Resistance Center* v. *Hart, supra,* 213 Cal.App.3d, at pages 304-305, it was held that the level of relief set for county payments must be based upon actual, rather than hypothetical, costs experienced within the county. In short, the broad branch of discretion to determine eligibility and level of benefits, as posited by the *Mooney* court, has been whittled away by judicial pronouncements to the point of its now appearing a thin wand indeed. Considerable speculation is required to conjure *any* grounds upon which a county currently can cause a measurable adjustment in its benefit obligations. It must supply subsistence levels of all major costs of living to all indigent adults in the county.

The second *Mooney* assumption which has proved inaccurate is that the county "can limit General Assistance payments to the financial resources

available." It is difficult to say (as is proved by a reading of the opposing briefs in this case) exactly what this phrase means. If it is to suggest that the county via eligibility standards and the setting of benefit levels can adjust payments to the money the county has available, the above paragraph provides a conclusive negative answer. If, on the other hand, the phrase was intended to indicate that impossibility of performance by the county is not a defense because the county has the capability of raising the money necessary to fund any program, then I conclude the comment is dated and no longer accurate.

The *Mooney* court did not, of course, have before it the record of fiscal emergency which has been presented in this case. *Mooney* was decided before Proposition 13, at a time when counties were essentially free to increase revenue from their principal source of funds, the property tax. Further, there was no issue in *Mooney* of possible fiscal impossibility—it was not an argument made by the county.

In my view *Mooney* did not address the issue of the county's discretion in funding state programs when the county is short of funds. *Mooney* simply assumed that funds could be raised, one way or another. As the findings of fact set forth above demonstrate, the county is *not* now in a position to expand its revenue-raising capabilities. Further, as those same factual findings illustrate, the county is pulled and strained in many conflicting directions by competing programs, each having a valid claim on the county's first priority of spending. The trial court did not attempt to identify which programs might be more important than, or at least as important as, the general relief program, stating only that continued full funding of the general relief program would harm "programs of equal importance and significance to the overall health, welfare, and safety of this County and its residents." I would surmise, however, that most reasonable people would agree that the care of county juvenile wards, the provision of indigent health services, the keeping of the peace, and no doubt numerous other county functions, are at least as important as the maintenance of indigent employable single people.

Before progressing in this analysis, one should ask the question: Is the principle of impossibility applicable to a county obligation imposed by state law? The answer is yes, and it is provided in a recent and well-reasoned opinion in *Board of Supervisors* v. *McMahon* (1990) 219 Cal.App.3d 286 [268 Cal.Rptr. 219]. The court there dealt with a county ordinance which precluded use of county funds for the welfare program. First concluding that the county had no standing to contest or countermand state laws, the court then directed its attention to the defense of impossibility: The county claimed that ". . . its financial straits leave it literally unable to comply with the state mandate." (*Id.* at p. 299.)

The appellate court in *McMahon* found, as a matter of fact from the evidence presented to the trial court, that impossibility of performance had not been demonstrated. The emergency claimed by the county was five years away, giving ample time for the county to address the problem. Further, the court found that no adequate attempt had been made by the county to raise additional revenue. Accordingly, the court denied the county's claims of impossibility by finding factually that they were not supported.

Preliminary to this finding, however, the court analyzed the issue of impossibility and held that it *was* a legal principle applicable to county obligations. Citing Civil Code section 3531, the court agreed that "The law never requires impossibilities." It continued by setting forth basic principles which are applicable to our case: "Impossibility means not only strict impossibility but also impracticability because of extreme and unreasonable difficulty, expense, injury or loss involved. (*Oosten* v. *Hay Haulers etc. Union* (1955) 45 Cal.2d 784, 788 [291 P.2d 17].) Consistent with this maxim, the law recognizes exceptions to statutory requirements for impossibility of performance. (*People* v. *Lake County* (1867) 33 Cal. 487, 492 [impossibility of performance makes mandatory statutory duty directory]; *County of San Diego* v. *Milotz* (1953) 119 Cal.App.2d Supp. 871, 883-884 [260 P.2d 282]; see 73 Am.Jur.2d, Statute, § 15, p. 278 ['[W]here strict compliance with the terms of a statute is impossible, compliance as near as can be has been permitted on the principle that the law does not require impossibilities.'].)" (*Board of Supervisors* v. *McMahon, supra,* 219 Cal.App.3d at pp. 299, 300.)

The *McMahon* court continued by making an observation which is pertinent to our case. It rejected the county's position because ". . . the County assert[ed] impossibility to excuse *entirely* its desired nonperformance." (219 Cal.App.3d at p. 300.) The argument which apparently would have carried more weight with the court would have been one which sought injunctive relief permitting the county "to comply *substantially* with the statutory mandates." (*Ibid.*) The reason I find this observation instructive is that the facts found by the trial court judge in this case do not support the conclusion that it is "impossible" for the county to fund the general relief program. The showing made, and as found by the trial judge, was that it is impossible to fund the program at its current prescribed level of benefits without damage to equally important programs. The conclusion that funding is required only to the extent reasonably possible, in light of other mandatory programs, would thus seem supported by *Board of Supervisors* v. *McMahon* (which appears to be the only case directly addressing the issue of "impossibility").

My attempt at summation of these conclusions would be as follows: When a county has exhausted all realistic means of raising funds; when it experiences severe budgetary shortfalls by reason of uncontrollably expanding

demands of vital programs; when it has no recourse but to cut all or even most of its vital programs, reducing the funding across the board; then and in such circumstances the county is not obligated to provide full funding for the general relief program, in the manner and to the extent which would be required were the county not facing fiscal crisis.

Were this, my opinion, to be included as part of the *per curiam* opinion, or a majority opinion, in this case, it would be subject to criticism as excessive dicta. As the writer of a mere concurring opinion, none of which has the force of precedent, I am free to state what I think should be the resolution of the issue so directly posed by the appeal. Whether this may be of any assistance to any of the parties to this action is no doubt debatable. At the very least, however, I would hope these observations would disabuse what otherwise might be inferred from our principal opinion, that the county in these dire circumstances lacks all discretion to act in protection of what it deems vital and necessary allocation of resources, notwithstanding so-called "mandated" expenditures imposed by state statute.

Respondents' petition for review by the Supreme Court was denied December 16, 1993.