[Nos. A122992, A123320. First Dist., Div. Three. Sept. 3, 2009.]

RONNIE WATKINS et al., Plaintiffs and Respondents, v.
COUNTY OF ALAMEDA et al., Defendants and Appellants.

## COUNSEL

Richard E. Winnie, County Counsel, Calvin C. James, Assistant County Counsel, and Andrew J. Massey, Associate County Counsel, for Defendants and Appellants.

Jennifer B. Henning for California State Association of Counties as Amicus Curiae on behalf of Defendants and Appellants.

Public Interest Law Project, Judith Z. Gold, Stephen Ronfeldt; Bay Area Legal Aid and Steven Weiss for Plaintiffs and Respondents.

## OPINION

McGUINESS, P. J.—In the 1990's, the Legislature amended the statutory scheme governing general assistance (GA) in order to allow counties to adopt specified restrictions on benefits and thereby obtain relief from the fiscal burdens of the state-mandated program.[1] The allowable restrictions were enacted as exceptions to the broad statutory mandate requiring counties to provide aid to indigent residents. One such restriction is authorized by Welfare and Institutions Code[2] section 17001.5, subdivision (a)(4) (hereafter section 17001.5(a)(4)), which permits a county to place a time limit upon the receipt of GA benefits by an "employable individual."

Relying upon the authorization contained in section 17001.5(a)(4), appellant County of Alameda implemented a time limitation on the receipt of GA

---

[1] Although the governing statutes employ the term "general assistance" (see Welf. & Inst. Code, §§ 17000.5, subd. (a), 17000.51, subd. (a), 17001.5, subd. (a)), some counties use the term "general relief" to refer to their general assistance programs.

[2] All further statutory references are to the Welfare and Institutions Code unless otherwise specified.

benefits by "employable" recipients, generally defined as persons under 64 years of age who have no physical, mental, or emotional incapacity that prevents them from working. At the urging of a number of GA recipients who challenged the county's GA time limitation, the trial court issued a writ of mandate directing the county to construe the term "employable individual" with reference to "practical employability factors," such as an individual's education, skills, and experience in light of the relevant labor market.

Section 17001.5(a)(4) does not compel such a restrictive view of the class of persons who may be subject to time limits on receipt of GA benefits. Rather, a definition of "employable individual" that turns upon one's physical and mental fitness for work is consistent with the plain meaning of the term, its common usage, and the intent of the Legislature in enacting section 17001.5.

By authorizing the limitations contained in section 17001.5, the Legislature intended to give counties meaningful options to reduce GA costs, fully aware that these cost savings would be achieved through reduced or periodically discontinued benefits for certain GA recipients who might suffer hardship as a result. Neither the state of the economy nor discomfort with the statute's consequences permits us to eviscerate section 17001.5(a)(4) by defining "employable individual" so narrowly that few GA recipients would actually have their benefits discontinued as a result of the time limitation. If economic conditions or policy considerations justify reexamination of the limitation authorized by section 17001.5(a)(4), the issue is properly addressed to the Legislature or the counties that have adopted the limitation.

We conclude the county acted within its discretion in implementing time limitations on GA benefits for able-bodied and mentally competent recipients, without regard to whether they may face practical barriers to employment. Accordingly, we reverse the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

The Alameda County General Ordinance Code (ACGO) provides for the establishment of a GA program to be administered by the Alameda County Social Services Agency (agency). (ACGO, § 7.04.010.) The agency issued the "Alameda County General Assistance Regulations" to implement the program.[3]

█ The ACGO directs the agency to administer an "employability program" under which the agency may place time limits on GA benefits received

---

[3] All further regulation references are to the Alameda County General Assistance Regulations (Regulations) unless otherwise specified.

by an "employable recipient," defined as "a recipient who does not have a medical statement of unemployability on file with the agency." (ACGO, § 7.08.060.A., G.) Under the "employability program," "[o]therwise eligible employable recipients become ineligible to receive general assistance after receiving three months of benefits within any twelve (12) month period." (*Id.*, § 7.08.060.F.)

To implement the employability program, the agency revised its GA regulations in November 2007 to provide that employable GA applicants and recipients would be limited to six months of benefits within any 12-month period.[4] (Regs., § 9-2-5.) The revised regulations provide that persons determined to be "unemployable" are not subject to time limits on receipt of GA benefits. (Regs., § 9-2-5.212.) In general, individuals are considered "unemployable" if they are 64 years of age or older, or if they have a physical, mental, or emotional incapacity, either permanent or temporary, that prevents them from working.[5] An employable recipient must have received or been offered job services before the agency may impose the six-month time limitation and discontinue benefits for the remainder of a 12-month period. (Regs., § 9-2-5.32.)

The employability program took effect on January 1, 2008, meaning that employable recipients who were receiving benefits as of that date would have their benefits discontinued beginning on July 1, 2008.[6] (Regs., § 9-2-5.) However, on June 6, 2008, Ronnie Watkins and five other individuals[7] (collectively referred to herein as Watkins) filed a verified petition for a writ of mandate challenging the County of Alameda's time limitation on GA benefits and naming as defendants the County of Alameda, the Board of Supervisors of Alameda County, the agency, and Yolanda Baldovinos, in her official capacity as interim director of the agency (collectively, the county).

---

[4] The agency's interim director explained that although section 17001.5(a)(4) authorizes limiting GA benefits to as few as three months in any 12-month period for employable individuals, the agency and the county's board of supervisors chose to provide six months of benefits, twice what the statute and the ACGO allow.

[5] Regulation 9-2-5.211 provides: "Unemployable applicants or recipients are determined to meet one or more of the following conditions: [¶] a. Have a physical, mental or emotional incapacity that prevents the person from working for 12 months or longer; this includes former SSI Drug & Alcohol persons who meet this criteria. [¶] b. Have a temporary physical, mental or emotional incapacity that prevents the person from working for a specified time period, which is less than 12 months. The period of incapacity does not include short term illnesses such as colds, flu, etc. that result in being unemployable for less than one calendar month. [¶] c. They are 64 years of age or older."

[6] As of March 2008, there were 8,510 GA recipients in the county, 76 percent of whom were classified as employable. Of the persons classified as unemployable, 42 percent were 64 years of age or older.

[7] The petition describes the six petitioners as county residents who were recipients of GA and who had been determined to be "employable."

The writ petition contains three causes of action. The trial court ultimately denied the relief sought in the first and third causes of action.[8] Those rulings are not challenged on appeal.

Watkins alleges in the second cause of action that the county's definition of "employable" is overbroad and contrary to several provisions of the Welfare and Institutions Code. According to Watkins, "Section 11000 mandates that the provisions of law pertaining to the GA program, including section 17001.5(a)(4) authorizing time limits only for an 'employable individual,' be 'fairly and equitably' construed to effectuate the objectives and purposes of the GA program. A fair and equitable construction of 'employable individual' is that the individual be actually, not theoretically, employable and that, in determining employability, such factors as the individual's education, skill level, work history, advanced age, and opportunity to obtain employment in the relevant labor market, be considered by the [a]gency."

Following a hearing on June 10, 2008, the trial court issued an alternative writ of mandate and a "temporary restraining order" prohibiting the county from discontinuing assistance to any GA recipient based on a determination the individual is employable until "such time as the Court hears and decides the issues presented."

After a further hearing on July 15, 2008, the trial court determined the county abused its discretion in defining "employable" to mean "able-bodied and mentally competent." Although the court acknowledged that the "various conditions, limitations and restrictions" authorized by section 17001.5 are "exceptions to the broad mandate of Section 17000," it nonetheless determined that a county's discretion in defining "employability" under section 17001.5 "does not exclude consideration of Sections 10000, 11000, and 17000." Relying on case law interpreting and applying the broad mandate of section 17000, the court reasoned that the county could not "substitute for 'employability' a wholly different concept like 'able-bodied and mentally competent,' because to do so excludes people who are not employable by virtue of their lack of skills, lack of experience, lack of language fluency, age or other factors." The court issued a writ of mandate directing the county to "comply with [its] duty to construe the term 'employability' or 'employable individual' in Welfare and Institutions Code Section 17001.5(a) fairly and equitably based upon practical employability factors, as required by the state's interest in providing [GA] benefits to indigents."

---

[8] In the first cause of action, Watkins asserts the agency had acted without proper authorization from the county's board of supervisors. The third cause of action contains allegations the agency's notices regarding employable status and discontinuation of benefits were "vague, confusing, and incomprehensible," in violation of Watkins's due process rights.

The county timely appealed from the judgment.[9]

This appeal requires us to consider whether the county's regulations imposing a time limitation upon the receipt of GA benefits by recipients deemed "employable" are consistent and not in conflict with section 17001.5(a)(4), which allows a county to limit GA relief to as few as three months in any 12-month period for an "employable individual" who has been allowed to participate in job skills or training sessions. In order to understand how section 17001.5(a)(4) fits within the statutory scheme, we first provide some background on the relevant statutes, their interpretation by the courts, and legislative developments driven by fiscal realities.

## I.

### *The Statutory Framework and Its Evolution*

■ "Section 17000 imposes upon counties a mandatory duty to 'relieve and support all incompetent, poor, indigent persons, and those incapacitated by age, disease, or accident,' when those persons are not relieved and supported by some other means.[10] [Citation.]" (*Hunt v. Superior Court* (1999) 21 Cal.4th 984, 991 [90 Cal.Rptr.2d 236, 987 P.2d 705].) Although the Legislature has enacted various specialized relief programs over the last several decades to aid indigent individuals, section 17000 provides the residual fund to sustain indigents who do not qualify for other specialized aid programs. (*Ibid.*) Commonly referred to as "general assistance," "general relief," or "GA," the program mandated by section 17000 is one of " 'last resort.' " (*County of San Diego v. State of California* (1997) 15 Cal.4th 68, 92 [61 Cal.Rptr.2d 134, 931 P.2d 312].) To be eligible for GA, one must typically have "no income, no savings or resources, and no financial support from family or friends." (*Robbins v. Superior Court* (1985) 38 Cal.3d 199, 207 [211 Cal.Rptr. 398, 695 P.2d 695].)

---

[9] In case No. A122992, the county appeals from the order granting in part the petition for writ of mandate, filed July 22, 2008, and from the statement of decision, filed August 22, 2008. In case No. A123320, the county appeals from the September 22, 2008 judgment, which takes the form of a writ of mandate. Thus, the county filed two separate appeals that are in effect a single challenge to the court's disposition of the writ petition, as ultimately reflected in the judgment by writ of mandate dated September 22, 2008. We consolidated the two appeals for all purposes.

[10] "Section 17000 states: 'Every county and every city and county shall relieve and support all incompetent, poor, indigent persons, and those incapacitated by age, disease, or accident, lawfully resident therein, when such persons are not supported and relieved by their relatives or friends, by their own means, or by state hospitals or other state or private institutions.' "

Two distinct obligations arise out of section 17000—the obligation to financially support the indigent through GA and the obligation to provide health care to "medically indigent persons." (*Hunt v. Superior Court, supra*, 21 Cal.4th at pp. 1002–1003.) Section 17000 establishes the "overarching 'macro' policy" of the state mandating that each county provide aid and relief to its indigent population. (*Pettye v. City and County of San Francisco* (2004) 118 Cal.App.4th 233, 245 [12 Cal.Rptr.3d 798].)

■ This state mandate is carried out by the counties through section 17001,[11] which "requires each county to 'adopt standards of aid and care for the indigent and dependent poor.' " (*Hunt v. Superior Court, supra*, 21 Cal.4th at p. 991, fn. omitted.) Through section 17001, the Legislature has "conferred broad discretion upon local governments to promulgate local, 'micro' policies in furtherance of this statewide mandate." (*Pettye v. City and County of San Francisco, supra*, 118 Cal.App.4th at p. 245.) "Within the overall state guidelines, counties retain extensive authority to set [GA] standards on matters ranging from eligibility to type and amount of relief and conditions attached thereto. [Citations.]" (*Ibid.*)

Although section 17001 "confers upon a county broad discretion to determine eligibility for—and the types of—indigent relief, this discretion must be exercised in a manner that is consistent with—and that furthers the objectives of—state statutes. [Citations.] These objectives are 'to provide for protection, care, and assistance to the people of the state in need thereof, . . . to promote the welfare and happiness of all of the people of the state by providing appropriate aid and services to all of its needy and distressed,' and to administer such aid and services 'promptly and humanely.' (§ 10000.) Furthermore, '[t]he provisions of law relating to a public assistance program shall be fairly and equitably construed to effect the stated objects and purposes of the program.' (§ 11000.)" (*Hunt v. Superior Court, supra*, 21 Cal.4th at p. 991.)

Historically, California courts had allowed counties substantial discretion in determining eligibility for indigent relief, the type and amount of relief, and the conditions attached to any such relief. (See *Adkins v. Leach* (1971) 17 Cal.App.3d 771, 778–779 [95 Cal.Rptr. 61].) In *Adkins v. Leach*, for example, the Court of Appeal held that Monterey County acted within its discretion in requiring applicants for GA to give an address within the county at which they resided. (*Id.* at p. 779.)

The legal landscape changed with the Supreme Court's decision in *Mooney v. Pickett* (1971) 4 Cal.3d 669 [94 Cal.Rptr. 279, 483 P.2d 1231]

---

[11] Section 17001 states: "The board of supervisors of each county, or the agency authorized by county charter, shall adopt standards of aid and care for the indigent and dependent poor of the county or city and county."

(*Mooney*). In *Mooney*, the court held that San Mateo County could not deny GA benefits on the ground an applicant was "employable," which was defined to include persons lacking a medically verifiable physical or emotional incapacity. (*Id.* at pp. 671–672, 674.) At the time, San Mateo County, like at least 13 other counties, had an "employable single man" rule denying GA relief to unmarried, able-bodied, and mentally competent men. (*Id.* at p. 675 & fn. 4.) While acknowledging the county's discretion to adopt standards of aid and care for the indigent, the court stated that this discretion "can be exercised only within fixed boundaries." (*Id.* at p. 679.) According to the court, GA was not statutorily limited to "unemployable persons," and a rule denying GA to "all unmarried employable persons" would leave them "without any source of relief whatsoever—a result inconsistent with the language and purpose of section 17000 and other statutes establishing [GA] relief." (*Id.* at pp. 680–681.) Although the court noted the county's financial concerns associated with abolition of the employable single man rule, the court stated it was "not fitted to write a new welfare law for the State of California, and while the Legislature addresses itself to that task it remains our task to enforce the existing law." (*Id.* at p. 680.) *Mooney* and subsequent cases make clear that fiscal difficulties do not justify disregard of the statutory mandate to provide GA to indigent persons. (*Ibid.*; *Robbins v. Superior Court, supra*, 38 Cal.3d at p. 217.)

In the decades following the decision in *Mooney*, California courts rejected attempts by counties to restrict GA benefits, reasoning that the restrictions had not been authorized by the Legislature and were inconsistent with the broad mandate of section 17000. (See *Robbins v. Superior Court, supra*, 38 Cal.3d at p. 212 ["courts have consistently invalidated city and county welfare regulations that fail to meet statutory requirements"]; see also *Clay v. Tryk* (1986) 177 Cal.App.3d 119, 121, 126–127 [222 Cal.Rptr. 729] [regulation denying GA for individuals in shared housing unless all group members are entitled to GA violated § 17000]; *Bernhardt v. Board of Supervisors* (1976) 58 Cal.App.3d 806, 812–813 [130 Cal.Rptr. 189] [invalidating regulation excluding young adults from GA who in theory could obtain parental support].)

Emblematic of the change following *Mooney* is the decision in *Nelson v. Board of Supervisors* (1987) 190 Cal.App.3d 25, 29 [235 Cal.Rptr. 305], in which the Court of Appeal held that San Diego County's regulation denying GA to indigent persons without residential addresses was invalid. The court emphasized that nothing in section 17000 or other GA statutes excluded persons lacking a fixed residential address from the class of indigent persons the county had a duty to relieve and support. (*Nelson*, at pp. 30–31.) Distinguishing the decision in *Adkins v. Leach, supra*, 17 Cal.App.3d 771, which had reached the opposite result, the court noted that "[t]he counties'

latitude in administering [GA] approved in *Adkins* has been qualified by *Mooney* v. *Pickett* . . . ." (*Nelson v. Board of Supervisors, supra,* 190 Cal.App.3d at p. 34.)

Beginning with *Boehm v. County of Merced* (1985) 163 Cal.App.3d 447 [209 Cal.Rptr. 530] (*Boehm*), a line of Court of Appeal decisions limited the discretion of counties to set standards of aid under section 17000 by holding "that each county must conduct a specific factual study of its residents' actual subsistence cost of living before setting the amount of [GA] grants. [Citations.]" (*Hunt v. Superior Court, supra,* 21 Cal.4th at p. 992.) The Legislature reacted to *Boehm* and its progeny in 1991 by enacting section 17000.5, which specified a minimum GA grant that was deemed to be " 'a sufficient standard of aid,' " regardless of its actual ability to alleviate poverty. (*Hunt v. Superior Court, supra,* 21 Cal.4th at p. 992; *Bell v. Board of Supervisors* (1994) 23 Cal.App.4th 1695, 1704–1705 [28 Cal.Rptr.2d 919] [§ 17000.5 standard of aid may not meet actual basic needs of GA recipients].) "By eliminating the requirement that counties undertake *Boehm* studies to determine the actual amount needed for minimum subsistence, [section 17000.5] provided a safe harbor for counties choosing to adopt this standard of aid. [Citations.]" (*Hunt v. Superior Court, supra,* 21 Cal.4th at p. 992; see also *Oberlander v. County of Contra Costa* (1992) 11 Cal.App.4th 535, 542 [15 Cal.Rptr.2d 182] [enactment of § 17000.5 was legislative equivalent of a repeal of *Boehm*].) In 1992, the Legislature amended section 17000.5 to clarify that the GA standard of aid could be satisfied with in-kind aid as well as with cash grants. (*Oberlander v. County of Contra Costa, supra,* at p. 545 & fn. 8; Stats. 1992, ch. 719, § 13, p. 3329.)

Section 17000.5 was just one of a number of statutes the Legislature enacted in the early 1990's to permit counties to reduce their GA costs. In the 1992 bill that amended section 17000.5 to specify that in-kind aid may satisfy a county's GA obligation, the Legislature also enacted former section 17001.5, which authorized counties to adopt restrictions on eligibility for GA. (Stats. 1992, ch. 719, § 14, p. 3330.)[12] Section 17001.5 as originally enacted in 1992 authorized counties to do the following: (1) adopt residency requirements for GA eligibility not exceeding 15 days, (2) limit GA benefits for applicants and recipients who shared housing with unrelated persons, (3) discontinue GA benefits for up to 180 days for any "able bodied and mentally competent" person who had received benefits for three months and

---

[12] On the court's own motion, we take judicial notice of the legislative history of the statutes adding and amending section 17001.5, including Statutes 1992, chapter 719, section 14, page 3330 (Assem. Bill No. 1012 (1991–1992 Reg. Sess.)), Statutes 1994, chapter 952, section 1, page 5602 (Assem. Bill No. 1965 (1993–1994 Reg. Sess.)), and Statutes 1996, chapter 206, section 34, page 1689 (Sen. Bill No. 1780 (1995–1996 Reg. Sess.)). (Evid. Code, §§ 452, subd. (c), 459; *PG&E Corp. v. Public Utilities Com.* (2004) 118 Cal.App.4th 1174, 1204, fn. 25 [13 Cal.Rptr.3d 630].)

who had failed to participate in job training or who had failed or refused without good cause to accept an offer of appropriate employment, and/or (4) discontinue aid to, or sanction, GA recipients who failed or refused without good cause to follow program requirements. (Former § 17001.5, subd. (a), as added by Stats. 1992, ch. 719, § 14, p. 3330.) The enrolled bill report prepared by the Health and Welfare Agency stated that the legislation could achieve "significant budget year and ongoing savings to county welfare programs (estimated to be tens of millions of dollars)," although it was acknowledged that the legislation "[c]ould present hardship for some GA recipients." (Cal. Health & Welf. Agency, Enrolled Bill Rep. on Assem. Bill No. 1012 (1991–1992 Reg. Sess.) Aug. 27, 1992, p. 2.)

As a further effort to relieve counties from fiscal burdens associated with GA obligations, the Legislature in 1993 enacted section 17000.6, which permits a county to adopt a GA standard of aid below the safe harbor amount specified in section 17000.5 if it can establish that meeting the standard described in section 17000.5 would result in "significant financial distress." (Stats. 1993, ch. 72, § 1, p. 1059.)

Section 17001.5 was originally scheduled to sunset on January 1, 1995. (Former § 17001.5, subd. (b), as added by Stats. 1992, ch. 719, § 14, p. 3330.) In 1994, the Legislature extended the provisions of section 17001.5 until January 1, 1997. (Stats. 1994, ch. 952, § 1, p. 5602.) The 1994 legislation eliminated the authority to reduce GA benefits for recipients who share housing but retained the other options for counties to limit GA benefits contained in the original version of section 17001.5. (Legis. Counsel's Dig., Assem. Bill No. 1965 (1993–1994 Reg. Sess.).)

An analysis prepared for the 1994 legislation confirms that former section 17001.5 was intended to limit GA expenditures. (Sen. Health & Human Services Com., Analysis of Assem. Bill No. 1965 (1993–1994 Reg. Sess.) as amended June 13, 1994, pp. 2–3.) The analysis pointed out that counties had "succeeded in obtaining 'mandate relief' that reduce[d] county fiscal liability for [GA]" by (1) enacting a cap on GA grants and allowing in-kind aid to be counted toward the standard of aid (§ 17000.5), (2) allowing counties to limit or reduce GA grants in certain circumstances (§ 17001.5), and (3) allowing counties to reduce GA grants below the level established in section 17000.5 upon a showing that compliance with the mandated levels would cause " 'significant financial distress' " (§ 17000.6). (Sen. Health & Human Services Com., Analysis of Assem. Bill No. 1965 (1993–1994 Reg. Sess.) as amended June 13, 1994, p. 2.) Although advocates of the 1994 legislation argued the bill would give counties "important tools with which to control [GA] costs," opponents of the legislation argued that extending the limits in section 17001.5 would "cause homelessness and hardships" for those unable to find jobs.

(Sen. Health & Human Services Com., Analysis of Assem. Bill No. 1965 (1993–1994 Reg. Sess.) as amended June 13, 1994, p. 3.) Opponents also pointed out that counties had a fiscal incentive to classify GA recipients as " 'able-bodied,' even if they [had] significant health problems." (*Ibid.*) Apparently in reaction to concerns raised by those opposed to extending section 17001.5, the 1994 legislation added a provision to section 17001.5 requiring the Legislative Analyst to conduct an evaluation of the impact of the section on GA recipients and applicants, including an assessment of whether the limitations authorized by section 17001.5 had an impact on homelessness among GA applicants and recipients. (Former § 17001.5, subd. (b), as amended by Stats. 1994, ch. 952, § 1, p. 5602.)

Because the provisions of former section 17001.5 were scheduled to sunset on January 1, 1997, the Legislature acted again in 1996 to extend the provisions of section 17001.5. (Stats. 1996, ch. 206, § 34, p. 1689.) The 1996 legislation not only eliminated the sunset provision but also changed the statute in certain respects. The amended statute again allowed for counties to reduce GA grants to persons in shared housing. (§ 17001.5, subd. (a)(2).) The revised statute also retained the provision permitting counties to deny GA benefits for up to 180 days to certain individuals who had failed without good cause to accept employment or participate in job training, although the authorization was amended to apply to a recipient who is "employable" instead of "able bodied and mentally competent." (§ 17001.5, subd. (a)(3).)

█ As relevant here, the 1996 legislation also added current subdivision (a)(4) of section 17001.5, which provides that a county may "[p]rohibit an employable individual from receiving aid under this part for more than three months in any 12-month period, whether or not the months are consecutive." Unlike subdivision (a)(3), which allows employable individuals to continue their GA eligibility beyond three months if they participate in job training and do not without good cause decline appropriate job offers, subdivision (a)(4) permits counties to impose a strict time limit on GA eligibility for employable persons, without regard to whether they participate in job training. However, as a condition of imposing the time limitation in subdivision (a)(4), the county must have made job training or skills training available to the GA recipient. (§ 17001.5(a)(4).) In an analysis of the 1996 statute, the limitation authorized in subdivision (a)(3) is described as a "work requirement," whereas the limitation authorized in subdivision (a)(4) is described as "time-limited aid." (Cal. Dept. of Finance, Enrolled Bill Rep. on Sen. Bill No. 681 (1995–1996 Reg. Sess.) Jan. 31, 1996, p. 4.)

Like earlier versions of section 17001.5, the statute as revised in 1996 gave "counties options to control [GA] program costs." (Cal. Dept. of Finance, Enrolled Bill Rep. on Sen. Bill No. 681 (1995–1996 Reg. Sess.) Jan. 31,

1996, p. 4.) Indeed, the cost savings associated with the shared housing provision alone was potentially $17 million per year. (*Id.* at p. 5.) It was estimated that counties could "realize significant savings beyond this, depending upon which combination of the remaining options [in section 17001.5] they [chose] to implement." (*Ibid.*)

To summarize, section 17001.5 arose out of legislative efforts in the early to mid-1990's to give counties tools to limit escalating GA costs. Following the *Mooney* decision, courts increasingly restricted the ability of counties to control GA costs through eligibility standards and other limitations not expressly authorized by section 17000 and related statutes. (See *Washington v. Board of Supervisors* (1993) 18 Cal.App.4th 981, 992 [22 Cal.Rptr.2d 852] (conc. opn. of Froehlich, J.) ["Since 1971 the judiciary has sharply delineated counties' discretion."].) Section 17001.5, along with sections 17000.5 and 17000.6, constituted the express authorization that had previously been lacking allowing counties to adopt GA standards that reduced costs of administering the state-mandated program.

## II.

### *Standard of Review*

The standard of review governing a challenge to the validity of administrative regulations is found in Government Code section 11342.2, which states: "Whenever by the express or implied terms of any statute a state agency has authority to adopt regulations to implement, interpret, make specific or otherwise carry out the provisions of the statute, no regulation adopted is valid or effective unless [1] consistent and not in conflict with the statute and [2] reasonably necessary to effectuate the purpose of the statute." (See *Communities for a Better Environment v. California Resources Agency* (2002) 103 Cal.App.4th 98, 108 [126 Cal.Rptr.2d 441].)

Under the first prong of the standard, we conduct an independent review of whether a regulation is consistent with the statute authorizing its adoption. (*Communities for a Better Environment v. California Resources Agency, supra,* 103 Cal.App.4th at p. 108.) "The question is whether the regulation alters or amends the governing statute or case law, or enlarges or impairs its scope. In short, the question is whether the regulation is within the scope of the authority conferred; if it is not, it is void." (*Ibid.,* fn. omitted.) "By contrast, the second prong of this standard, reasonable necessity, generally does implicate the agency's expertise; therefore, it receives a much more deferential standard of review," consisting of whether the action was "arbitrary, capricious, or without reasonable or rational basis." (*Id.* at p. 109, fns. omitted.)

Although Government Code section 11342.2 by its terms applies only to "state agenc[ies]," the statute applies equally to counties that adopt GA standards or regulations pursuant to state law. (See *Mooney, supra*, 4 Cal.3d at p. 679 [applying predecessor to Gov. Code, § 11342.2 (former § 11374) to question of whether county GA regulations were valid].) This is so because the county acts as an agent of the state in administering GA relief. (4 Cal.3d at p. 679.)

## III.

### *Statutory Interpretation of "Employable"*

In order to determine whether the county appropriately exercised its discretion in defining the term "employable," we must consider the meaning of that term as it is used in section 17001.5, subdivision (a).

■ We are guided by familiar principles in interpreting the statute's language. "Our fundamental task in interpreting a statute is to determine the Legislature's intent so as to effectuate the law's purpose. We first examine the statutory language, giving it a plain and commonsense meaning. We do not examine that language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment. If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend. If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy. [Citations.]" (*Coalition of Concerned Communities, Inc. v. City of Los Angeles* (2004) 34 Cal.4th 733, 737 [21 Cal.Rptr.3d 676, 101 P.3d 563].) "If the meaning of the statute remains unclear after examination of both the statute's plain language and its legislative history, then we proceed cautiously to . . . apply 'reason, practicality, and common sense to the language at hand.' [Citation.]" (*Ailanto Properties, Inc. v. City of Half Moon Bay* (2006) 142 Cal.App.4th 572, 583 [48 Cal.Rptr.3d 340].) With the consequences that will flow from our interpretation in mind, we must give the words of the statute a workable and reasonable interpretation. (*Ibid.*)

The trial court characterized the definition of "employable" used by the county as synonymous with "able-bodied and mentally competent." Watkins contends this broad definition of the term applies to persons who, because of a lack of skills, education, or work experience, might lack any reasonable

chance of obtaining employment. He asserts that the county's "disability-focused" definition improperly fails to take into account a person's skills, experience, education, literacy, vocational capacities, and other "practical employability factors."[13]

■ As an initial matter, the trial court's characterization of the county's de facto definition of "employable" is not entirely accurate. Although it is true as a general matter that persons who are able-bodied and mentally competent qualify as employable under county standards, the county's criteria actually define a class of employable persons broader than just those who lack a physical or mental incapacity. For example, persons 64 years of age or older are not considered employable, regardless of whether they are able-bodied and mentally competent. (Regs., § 9-2-5.211(c).)

More importantly, the county's definition of "unemployable," which in effect determines who is "employable," specifies that one must have a "physical, mental or emotional incapacity that *prevents the person from working* . . . ." (Regs., § 9-2-5.211(a), italics added.) Under this definition, persons who are physically or mentally disabled could nevertheless qualify as employable if their disability does not prevent them from doing some form of work. Watkins concedes that a person who is "not 'able-bodied' might still have marketable skills making him 'employable;' there are millions of people with disabilities who lead productive work lives because of their skills, education, family support, or other factors." The county's regulation allows for the possibility that otherwise disabled persons may nonetheless be employable because their disabilities do not prevent them from working. Having a disability, by itself, does not render a person unemployable under the county's regulations. Thus, while it may be convenient to equate the county's definition of "employable" with "able-bodied and mentally competent," in reality the term is broader than just persons lacking a physical or mental incapacity.

## A. *Plain Meaning of "Employable" and Common Usage of the Term*

Even assuming the county's definition of "employable" is synonymous with "able-bodied and mentally competent," such a definition would nonetheless be consistent with a plain and commonsense meaning of the term. The

---

[13] The dissent states that the county's definition also improperly fails to take into account recipients who are unable to work because they are caring for a young child or a disabled adult. (Dis. opn., *post*, at p. 359.) This purported basis for invalidating the county's time limits on GA assistance is not properly before this court. Watkins does not advance this argument on appeal, and as far as we are aware, did not challenge the county's regulations on this basis in the trial court. Instead, Watkins focuses on vocational factors that may bear on a recipient's ability to find employment.

fourth edition of Webster's New World College Dictionary defines "employable" as "that can be employed," and specifically lists "physically or mentally fit to be hired for work" as a meaning subsumed within the more general definition. (Webster's New World Dict. (4th college ed. 2001) p. 466, col. 2.) Watkins points out that the definition contains a second meaning subsumed within the general definition, "meeting the minimum requirements for a specified kind of work or position of employment." (*Ibid.*) He contends the full definition contradicts the position that able-bodied is equivalent to employable. We disagree. The two examples offered are independent of one another and describe alternative subsenses of the more general definition. Further, the first listed meaning of the term describes employability in a general sense, whereas the second meaning is limited to a person's suitability for a "specified kind of . . . position." The second meaning is therefore irrelevant to the question the county must consider when determining as a general matter whether an individual is employable. There is no suggestion the county must assess a person's employability only by reference to specific jobs.

In support of his proposed interpretation of employable, Watkins cites dictionary definitions describing the word in terms of one's capability or ability to be employed.[14] For example, the 11th edition of Merriam-Webster's Collegiate Dictionary defines "employable" as "capable of being employed." (Merriam-Webster's Collegiate Dict. (11th ed. 2007) p. 408, col. 2.) Watkins mistakenly suggests this definition somehow contradicts the county's proposed interpretation of the term. To the contrary, "capable of being employed" is not necessarily inconsistent with a definition of employable that turns on physical and mental fitness for work. Indeed, in Webster's Third New International Dictionary, the more general definition of "employable," listed as "capable of being employed," is further defined specifically as "physically and mentally capable of earning a wage at a regular job and available for hiring." (Webster's 3d New Internat. Dict. (2002) p. 743, col. 3.)

As reflected in the various dictionary definitions, the term "employable" is reasonably susceptible of the interpretation the county has given it. In addition, common usage of the term—as applied in similar welfare programs of last resort throughout the nation—is consistent with the county's interpretation. The county presented the trial court with a litany of states that define "employable" individuals for purposes of GA programs to include persons

---

[14] Watkins resorts to an online British dictionary (www.dictionary.cambridge.org) to find a definition of "employable" that is to his liking, in that it defines the word as "having enough skills and abilities for someone to employ you."

with the physical and mental capacity to hold a job, without regard to skills, education, or other so-called practical employability factors.[15]

Further, the definition of "employable" as used in GA programs appears to be relatively consistent throughout the nation, as indicated in a 1999 Urban Institute study made available to the trial court. That study reported that 35 states, including the District of Columbia, had GA programs during 1998, or just two years after adoption of current section 17001.5(a)(4). (Gallagher et al., State General Assistance Programs 1998 (Urban Inst. 1999) p. 1.) Although the study confirmed that various jurisdictions had differing eligibility and program requirements, there was relative consistency among jurisdictions in defining "unemployable persons." In general, categories of unemployable persons included those with a disability, persons over a certain age, persons who acted as a caretaker for an incapacitated spouse or child, and persons in a drug or alcohol abuse treatment program. (*Id.* at pp. 25–27.) The study did not identify persons who lack practical employability skills as "unemployable." Instead, such persons fell into the "employable adults without children" category and were described as "[a]ble bodied adults with some barriers to employment," such as "lack of education or inability to speak English."[16] (Gallagher, at p. 29, italics omitted.)

Therefore, as confirmed by a nationwide study of GA programs, the common usage of the term "employable" is consistent with the interpretation urged by the county. The legislative history of section 17001.5 reflects that the Legislature was aware of the experiences of at least several other states with GA programs, including those that had restricted eligibility for benefits.[17] (See Sen. Health & Human Services Com., Analysis of Assem. Bill No. 1965 (1993–1994 Reg. Sess.) as amended June 13, 1994.)

---

[15] Connecticut is an example of a state that defines "employable" in the GA context primarily by reference to whether one is physically or mentally impaired. (Conn. Gen. Stat., § 17b-194, subd. (a).) The definition of "employable" does not turn on practical employability factors, such as vocational capacity or labor market conditions. (*Ibid.*) As reflected in *Moore v. Ganim* (1995) 233 Conn. 557, 562–563 [660 A.2d 742, 746], the State of Connecticut amended its GA laws in 1992 to provide that employable individuals—who had previously not been subject to a durational limit on GA benefits—were restricted to receiving nine months of GA financial assistance in each 12-month period. The Connecticut Supreme Court rejected a challenge to this statutory durational limit. (*Id.*, 660 A.2d at p. 771.)

[16] The Urban Institute report also indicates that time limitations on GA benefits typically apply to "able-bodied adults." (Gallagher et al., State General Assistance Programs 1998, *supra*, at pp. 2–3.) The report explains: "Although the two most populous states, California and New York, provide [GA] to able-bodied adults without children, few others do the same. Only 13 states provide GA to this population, down from 15 states in 1996. In addition, many states that provide assistance to able-bodied adults without children limit the duration of assistance to this group and/or provide in-kind assistance rather than cash." (*Ibid.*)

[17] As an article relied upon by Watkins explains, many of the states with GA programs made cuts to their programs in the early 1990's. According to the article, the states that cut aid to

Watkins claims the common usage of "employable" outside the GA context supports his view that an assessment of employability turns on an individual's skills, experience, education, literacy, and vocational capacities. He relies on authority discussing "actual employment prospects" in the context of disability insurance, "earning capacity" in family law, and "employability" under the Social Security Disability Insurance program as well as under CalWORKS. The terms and definitions cited by Watkins are inapposite in the GA context because they reflect laws, policies, and statutory schemes designed for different purposes and to alleviate different ills.[18]

Although the county's definition of "employable" is consistent with its common usage, it is nonetheless the case that the term is also reasonably susceptible to the interpretation advanced by Watkins. Accordingly, we turn to the legislative history of the statute and other interpretative aids to assess the Legislature's intent.[19] As we explain, there are numerous reasons to conclude that the term "employable individual[s]" as used in section 17001.5(a)(4) was not intended to have the restricted meaning proposed by Watkins.

---

"employable" adults in that period included Connecticut, Ohio, Illinois, Pennsylvania, Massachusetts, Minnesota, Maryland, Wyoming, Rhode Island, and Virginia. It is reasonable to assume the Legislature was aware of this trend, as suggested by the legislative history.

[18] The dissent cites various sources for the proposition that the county's definition of "employable" is a departure from the common understanding of the term "in the marketplace." (Dis. opn., *post*, at pp. 355, fn. 10, 358–359.) Among the views offered are opinions contained in declarations from a former Secretary of Labor and a vocational expert who commonly testifies before the Social Security Administration. In our view, the trial court properly sustained objections to the portions of the declarations cited by the dissent. It is ultimately for the court to determine the scope of the term "employable" as intended by the Legislature. What an economist or Social Security vocational expert proposes as a definition of the term is irrelevant to our determination, absent some indication that their opinions bear upon the Legislature's intent.

[19] According to the county, other California counties that have adopted time limitations on the receipt of GA benefits classify employable individuals in a manner similar to the approach used by the county. The fact that other counties have adopted a similar interpretation tends to confirm the plausibility of the county's construction. We are also mindful that a consistent and long-standing administrative interpretation of a statute, which the Legislature is presumed to know, may reflect legislative approval of the administrative interpretation. (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 22 [78 Cal.Rptr.2d 1, 960 P.2d 1031].) Nevertheless, actions taken by other counties are not determinative of the Legislature's intent, and our consideration of the issue is hampered in any event by the limited record the county has assembled to support its assertion. We are reluctant to draw any far-reaching conclusions based upon the few regulations contained in the record on appeal. Suffice it to say, however, that the cited regulations generally support the proposition that "employable individual" is typically defined by reference to one's physical or mental fitness rather than practical barriers to employment. As reflected in the record on appeal, a survey of 15 other counties indicates that only a few consider factors such as education, job skills, prior employment, or the state of the current job market in assessing employability.

## B. *"Employable" Viewed in Context of Section 17001.5*

 The term "employable" cannot be considered in isolation but must be examined in the context of the statute in which it appears. Section 17001.5 tethers the determination of whether a person is "employable" to the requirement that such a person participate in or have access to job skills training. Under subdivision (a)(3) of the statute, counties may require "employable" recipients who have already received three months of benefits to participate in job training as a condition of receiving further GA benefits. Under subdivision (a)(4), counties may impose a time limitation upon receipt of GA benefits by "employable individual[s]," but only if those individuals have been offered the opportunity to participate in job training. By linking employability with job training, the Legislature recognized that "employable" recipients may face barriers to employment that can be overcome with skills or training sessions. Notably, the statute does not expressly authorize counties to condition receipt of benefits by unemployable persons upon participation in job skills or training sessions. Nor is there a requirement that a county must even offer such programs to anyone other than someone deemed employable.

 Under Watkins's proposed interpretation of section 17001.5(a)(4), able-bodied and mentally competent persons who lack the necessary skills, language ability, or other qualifications deemed necessary by employers, or who cannot find employment because of general economic conditions, would *not* be considered "employable individuals." As a result, such persons would be exempt from the work requirements authorized by subdivision (a)(3) and the time limitations authorized by subdivision (a)(4) of section 17001.5. They would have no obligation to participate in job training, and the county would have no obligation to make job training available to them. The consequence of Watkins's proposed interpretation of the term "employable" is that the individuals most in need of job training and skills development would be denied the very tools needed to overcome their barriers to employment. The only persons who could be required to participate in job training are the "employable" recipients who, under the interpretation proposed by Watkins, presumably have little or no need for such training. Therefore, under Watkins's view of section 17001.5, the rationale underlying job training would be turned on its head. Training would not be required of those most in need but would be provided only to those who could least benefit. Because Watkins would classify persons lacking "practical employability factors" as "unemployable," and therefore not subject to time limitations on receipt of GA benefits, adopting his view would create a permanent caste of "unemployables" entitled to GA benefits indefinitely. When a proposed interpretation of a statute leads to such an absurd consequence, it must be rejected.

Watkins's efforts to address this concern expose the weakness of his position. For the most part, Watkins argues as a *factual* matter that the county

has failed to provide meaningful job assistance and training to persons deemed employable. The suggestion appears to be that the programs the county has adopted would not aid persons deemed "unemployable," even if they were allowed or required to participate in them. However, the issue is legal and not factual in nature. The point is that the statute evinces a Legislative intent to link job training to the availability of GA benefits for employable persons. This intent is inconsistent with the notion that persons lacking skills and therefore most in need of job training would not qualify as employable individuals entitled to job training. For purposes of assessing legislative intent, it is irrelevant that, as a factual matter, the county's job training efforts may have been less than successful.

Watkins also contends that nothing prevents a county from offering job training to unemployable GA recipients. While true, the argument misses the point. The Legislature could have specified that job training requirements apply to all GA recipients, regardless of whether they are employable or unemployable. It chose not to. Instead, it applied the requirements solely to employable individuals, supporting a conclusion the Legislature viewed employable individuals but not unemployable individuals as amenable to job training.

One might argue the county is permitted to require unemployable GA recipients to participate in job training under subdivision (a)(5) of section 17001.5, which authorizes counties to discontinue aid to GA recipients for failure or refusal without good cause to "follow program requirements." Even Watkins rejects this contention, asserting it would be "futile and inhumane to require unemployable . . . people to participate in job training and work search activities (and sanction them for failing to do so), or to suspend aid for such recipients . . . ."[20] In any event, the argument misses the mark.

As an initial matter, it is difficult to imagine the Legislature contemplated that counties would be able to require persons unable to work because of a disability—who would fall into the "unemployable" category under any definition—to participate in job training or risk losing GA benefits.[21] Further, there is no reference in section 17001.5, subdivision (a)(5) to "employable" or "unemployable" individuals, nor is there any reference in the subparagraph to job training requirements. Thus, the subparagraph has no bearing on the relationship between a GA recipient's status as "employable" or "unemployable," on the one hand, and the need for or availability of job training on the other hand.

---

[20] Although Watkins does not embrace the argument, it is nonetheless advanced in the dissent. (Dis. opn., *post*, at p. 363, fn. 15.)

[21] Section 17200 authorizes counties to require work of an indigent as a condition of receiving GA benefits. Notably, such requirements are only allowed with respect to a person "who is not incapacitated by reason of age, disease, or accident." (§ 17200.)

In short, Watkins's proposed interpretation of section 17001.5 is inconsistent with the Legislature's intent, as evidenced by the relationship between job training and allowable restrictions on employable persons. Although Watkins contends the lack of practical employability factors renders certain able-bodied and mentally competent GA recipients "unemployable," this designation would exempt them from the very job training sessions presumably designed to remedy their skill deficits. This illogical result counsels in favor of rejecting Watkins's interpretation of "employable."

## C. *Significance of "Notwithstanding" Clause*

Watkins argues the county's definition of "employable" violates overarching statutory requirements requiring welfare programs to be administered humanely, fairly, and equitably. He cites a line of cases starting with *Mooney* standing for the proposition that counties have no authority to carve out exceptions to GA eligibility the Legislature has not specifically authorized. He also cites the principle that a county's fiscal challenges do not excuse compliance with the requirements of section 17000.

Watkins's arguments ignore the fact that section 17001.5 was specifically enacted as an exception to the mandate of section 17000. Section 17001.5, subdivision (a) begins, "Notwithstanding any other provision of law, including, but not limited to, Section 17000.5," a county may adopt any or all of five separate restrictions on eligibility for GA benefits. The litigants dispute the significance of the "notwithstanding" clause, with the county urging that it be given its plain meaning and Watkins arguing for a narrow interpretation that can be harmonized with the goals of the welfare statutes. As we explain, Watkins's proposed interpretation fails to give effect to the plain meaning of the phrase.

Watkins contends the "notwithstanding" clause in section 17001.5, subdivision (a) does not override the policy goals of the welfare statutes, citing the principle that implied repeal of a statute is strongly disfavored. (See *Sanford v. Garamendi* (1991) 233 Cal.App.3d 1109, 1121–1122 [284 Cal.Rptr. 897].) Implied repeal of an earlier statute should not be found unless "the later provision gives undebatable evidence of an intent to supersede the earlier. [Citation.]" (*Id.* at p. 1122.) When two seemingly inconsistent statutes apply, we harmonize the competing statutes and "avoid an interpretation that requires one statute to be ignored." (*Chatsky & Associates v. Superior Court* (2004) 117 Cal.App.4th 873, 876 [12 Cal.Rptr.3d 154].) Recognizing that the limitations allowed under section 17001.5, subdivision (a) are inconsistent with the broad policy goals of state welfare legislation, Watkins would have us harmonize section 17001.5(a)(4) with more general statutes governing how welfare statutes are to be applied.

Watkins's argument regarding implied repeal is specious. The contention might make sense in a context in which (1) a statute containing a "notwithstanding any other provision of law" clause directly conflicts with an entirely different statutory scheme, and (2) there is no indication the Legislature was aware of the conflict. That is not the case here. The legislative history makes clear that the Legislature intended to give counties authority to override the broad mandate of section 17000 in specified circumstances. Indeed, the "notwithstanding" clause of section 17001.5, subdivision (a) specifically mentions section 17000.5, which was itself enacted as a safe harbor from judicially imposed requirements read into section 17000. (See *Hunt v. Superior Court, supra,* 21 Cal.4th at p. 992.)

■ Watkins concedes that section 17001.5, subdivision (a) was intended to take the place of section 17000, but nonetheless argues that it does not supersede the general policy provisions governing application of welfare statutes, sections 10000 and 11000.[22] We are unpersuaded. Sections 10000 and 11000 contain general statements of policy applicable to all welfare statutes contained in division 9 of the Welfare and Institutions Code. These principles, which generally require the humane, fair, and equitable application of welfare laws, are already incorporated into the dictate of section 17000. (Cf. *Robbins v. Superior Court, supra,* 38 Cal.3d at p. 208.) It is these principles that give section 17000 its broad application. If, as Watkins concedes, section 17001.5 supersedes section 17000, it necessarily supersedes the more general principles contained in sections 10000 and 11000. (Cf. *Board of Supervisors v. Superior Court (Comer)* (1989) 207 Cal.App.3d 552, 564 [254 Cal.Rptr. 905] [statute setting limits on mental health services implicitly limited duty imposed by § 17000 and controlled over more general policy statement in § 10000].)

■ Section 17001.5, subdivision (a) contains no specific language or exceptions to suggest the plain meaning of the phrase "[n]otwithstanding any other provision of law" may be ignored. The clause means what it says. We do not mean to suggest counties may rely on section 17001.5 to adopt restrictions on GA beyond what is specifically authorized by that section.

---

[22] Section 10000 provides: "The purpose of this division is to provide for protection, care, and assistance to the people of the state in need thereof, and to promote the welfare and happiness of all of the people of the state by providing appropriate aid and services to all of its needy and distressed. It is the legislative intent that aid shall be administered and services provided promptly and humanely, with due regard for the preservation of family life, and without discrimination on account of ancestry, marital status, political affiliation, or any characteristic listed or defined in Section 11135 of the Government Code. That aid shall be so administered and services so provided, to the extent not in conflict with federal law, as to encourage self-respect, self-reliance, and the desire to be a good citizen, useful to society."

Section 11000 provides: "The provisions of law relating to a public assistance program shall be fairly and equitably construed to effect the stated objects and purposes of the program."

However, the restrictions on GA eligibility contained in subdivision (a) of section 17001.5 must be given effect so as to serve the purpose of that statute, without regard to whether the authorized restrictions conflict with sections 10000, 11000, or 17000.

The flaw in Watkins's analysis is that he interprets the term "employable" in section 17001.5(a)(4) in order to satisfy the broad mandate of section 17000 and the policy goals of sections 10000 and 11000. He interprets section 17001.5(a)(4) in a manner that effectively disallows the authorized limitations, construing it to satisfy the very statutes—sections 10000, 11000, and 17000—from which it serves as an exception. While this approach may satisfy broad policy goals underlying GA, it eviscerates the limitations on GA authorized by section 17001.5 and ignores the Legislature's intent in enacting section 17001.5(a)(4).

As the discussion of the legislative history in part I., *ante*, demonstrates, the Legislature was keenly aware that the limitations authorized by section 17001.5 would have consequences. It was anticipated that counties could "realize significant savings" in GA expenditures by adopting one or more of the limitations authorized by section 17001.5.[23] (Cal. Dept. of Finance, Enrolled Bill Rep. on Sen. Bill No. 681 (1995–1996 Reg. Sess.) Jan. 31, 1996, p. 5.) To achieve these savings it was understood the limitations would present hardship for some persons who would otherwise be eligible for GA benefits. (See, e.g., Cal. Health & Welf. Agency, Enrolled Bill Rep. on Assem. Bill No. 1012 (1991–1992 Reg. Sess.) Aug. 27, 1992, p. 2.) Thus, at the time the Legislature adopted section 17001.5(a)(4), there was an expectation that significant numbers of GA recipients would be subject to time limitations.

Watkins ignores this legislative history and instead relies on case law addressing attempts by counties to impose unauthorized restrictions on GA assistance or medical care that conflict with the broad mandate of section

---

[23] The dissent asserts that section 17000.6, which allows a county to reduce the level of aid upon a finding of significant financial distress, is the mechanism through which a county may obtain relief from financial burdens associated with GA. (Dis. opn., *post*, at p. 364.) The dissent suggests this option is the sole recourse for counties seeking to reduce GA costs and that it violates the basic purpose of the GA program to achieve savings by redefining conditions of eligibility, even if authorized by section 17001.5. (Dis. opn., *post*, at p. 364.) We disagree. Section 17000.6 is just one of several options available to counties to control GA costs, including the limitations authorized by section 17001.5. (Sen. Health & Human Services Com., Analysis of Assem. Bill No. 1965 (1993–1994 Reg. Sess.) as amended June 13, 1994.) The legislative history plainly shows that section 17001.5 was enacted to give counties additional options to control GA costs. There is nothing improper about a county adopting one or more of the limitations authorized by section 17001.5 for the purpose of controlling GA costs so long as the limitation does not exceed the statutory authorization contained in section 17001.5.

17000. For the most part, the cases relied upon by Watkins either predate the limitations on GA authorized by the Legislature in the 1990's or address the obligation to provide medical care, as opposed to GA benefits.[24] These cases have little bearing on our interpretation of the limitations on GA benefits authorized by section 17001.5. We have no disagreement with the general proposition Watkins draws from these cases that counties may not "carv[e] out exceptions to the broad mandate of Section 17000 that the Legislature has not authorized." That principle is inapplicable here, however, because the Legislature has specifically authorized an exception to the broad mandate of section 17000 in section 17001.5.

The dissent, while acknowledging that section 17001.5 authorizes restrictions on GA benefits, nonetheless asserts the restrictions are limited in scope. (Dis. opn., *post*, at pp. 362–364.) With respect to the time limitation authorized by section 17001.5(a)(4), the dissent argues that "[n]owhere in the language or history of this provision is there a suggestion that persons who, despite their best efforts, are unable to obtain employment can nonetheless be deemed 'employable' and denied minimal, last-resort, GA subsistence benefits for nine months of the year." (Dis. opn., *post*, at p. 363.) While this view may satisfy the broad policy mandate of section 17000, it ignores the plain language of section 17001.5(a)(4) and fails to appreciate the distinction between subdivision (a)(3) and (4) of section 17001.5.

 Subdivision (a)(3) of section 17001.5, the "work requirement," allows employable individuals to receive GA indefinitely so long as they participate in job training, pursue employment, and accept reasonable job offers. Under section 17001.5, subdivision (a)(3), a recipient's GA benefits would not be discontinued if the recipient were unable to find employment through no fault of his own. By contrast, section 17001.5(a)(4), the "time limitation" provision at issue in this appeal, does not hinge on a recipient's participation in job training or good faith efforts to find employment. Instead, a county may discontinue benefits for employable individuals under section 17001.5(a)(4) regardless of whether the recipient participated in job training, provided the programs were made available to the recipient. By its plain terms, section 17001.5(a)(4) authorizes time limits on benefits without regard to whether the recipient is at fault for failure to find employment. As a result of conflating subdivision (a)(3) and (4) of section 17001.5, the dissent essentially reads section 17001.5(a)(4) out of the statute.

In sum, the limitations authorized by section 17001.5 must be given effect so as to effectuate the Legislature's intent in enacting that statute. Watkins's

---

[24] The obligation to provide medical care pursuant to section 17000 is independent of the obligation to pay GA benefits. (*Hunt v. Superior Court, supra*, 21 Cal.4th at pp. 1002–1003.) Section 17001.5 addresses only GA benefits, not medical care. Likewise, section 17000.5 is limited by its terms to GA. (*Hunt v. Superior Court, supra*, at p. 1003.)

restrictive interpretation of "employable" ignores the legislative intent to provide counties meaningful options to control GA costs.

D. *Replacing "Able-bodied and Mentally Competent" with "Employable"*

Watkins places great emphasis on the Legislature's decision to replace the language "able-bodied and mentally competent" in former section 17001.5, subdivision (a)(3) with "employable," a change that was made at the same time the Legislature enacted the current version of section 17001.5(a)(4). (Stats. 1996, ch. 6, § 9, p. 29.) He contends this substitution demonstrates a legislative recognition that "able-bodied and mentally competent" is different from and broader than "employable." Watkins draws the wrong conclusion from the revision to the statutory language. As we explain, while "able-bodied and mentally competent" may indeed be different from "employable," there is no indication the Legislature viewed "employable" as a more restrictive term than "able-bodied and mentally competent."

The legislative history provides few clues explaining why the Legislature substituted "employable" for "able-bodied and mentally competent." The only statement directly addressing the change is contained in the Department of Finance Enrolled Bill Report for Senate Bill No. 681, which states, "This bill would alter the criterion of 'able-bodie[d] and mentally competent' by changing it to 'employ[able].' *Counties believe the current criteria are too restrictive* and that it is difficult to get many recipients into job training."[25] (Cal. Dept. of Finance, Enrolled Bill Rep. on Sen. Bill No. 681 (1995–1996 Reg. Sess.) Jan. 25, 1996, p. 4, italics added.) While the cited passage indicates the Legislature did not believe that "able-bodied and mentally competent" was synonymous with "employable" as used in section 17001.5, it does not support the conclusion the Legislature adopted the term "employable" in order to narrow the category of GA recipients subject to the limitations allowed by section 17001.5, subdivision (a). To the contrary, the change arose out of the counties' concern that the "[then-]current criteria [were] too restrictive," plainly signaling that the current criteria are *less* restrictive, and thus permit a county to expand the category of GA recipients whose benefits may be limited.

The change in language appears to have been prompted by concerns raised by counties. It makes little sense to suggest that counties would have

---

[25] The report includes two typographical errors, referring to "able-bodies" rather than "able-bodied" and to "employment" rather than "employable." An enrolled bill report from earlier legislation, from which the language of Senate Bill No. 681 (1995–1996 Reg. Sess.) was derived, contains the same analysis as the enrolled bill report for Senate Bill No. 681 but without the typographical errors. (Cal. Dept. of Finance, Enrolled Bill Rep. on Assem. Bill No. 858 (1995–1996 Reg. Sess.) Sept. 15, 1995.) On the court's own motion, we take judicial notice of this enrolled bill report. (Evid. Code, §§ 452, subd. (c), 459.)

advocated narrowing the category of persons subject to limitations on GA. After all, section 17001.5 does not require counties to impose the restrictions it authorizes. If a county does not want to restrict GA benefits to certain aid recipients, it can simply choose not to adopt the restrictions authorized by section 17001.5. Such a county would have no reason to advocate more narrowly defining the category of persons who may be subject to restrictions on GA benefits. By contrast, counties that seek to adopt restrictions on GA benefits have an incentive to expand the category of recipients subject to restrictions. Indeed, as recognized in the legislative history of the 1994 amendments to former section 17001.5, counties had a strong fiscal incentive to classify GA recipients as able bodied, in which case they would be subject to job training and work requirements, even if the recipients had significant health problems. (Sen. Health & Human Services Com., Analysis of Assem. Bill No. 1965 (1993–1994 Reg. Sess.) as amended June 13, 1994, p. 3.) By replacing "able-bodied and mentally competent" with "employable," the 1996 legislation permitted counties to classify disabled recipients whose physical or emotional limitations did not prevent them from working as "employable," a result entirely consistent with the county's approach to the matter.

The unequivocal purpose of the 1996 amendments to former section 17001.5 was to give counties more options to realize cost savings in the administration of GA programs. It is illogical to suggest the Legislature would have rejected "able-bodied and mentally competent" in favor of a circumscribed definition of "employable" that would result in markedly lower cost savings with fewer GA recipients being subject to restrictions on aid.

The legislative history indicates the Legislature adopted "employable" as a less restrictive variant of its predecessor, "able-bodied and mentally competent." There is no indication the Legislature intended to scrap the former definition altogether in favor of the entirely different approach that Watkins advocates. Instead, the term "employable" afforded counties greater flexibility in enacting the restrictions authorized by section 17001.5. The legislative history contains not even a hint that the Legislature intended the meaning of the term "employable" to turn on practical barriers to employment, such as lack of skills or language ability.

E. *Interpreting "Employable" in Light of* Mooney

In *Mooney, supra,* 4 Cal.3d at page 671, San Mateo County attempted to implement an absolute prohibition on eligibility for GA cash aid for employable single men. The Supreme Court struck down the prohibition, holding that it was not within the scope of a county's authority to establish standards of aid under section 17001. Watkins relies heavily on *Mooney,* contending the Legislature is presumed to have been aware of the decision that purportedly

criticized a definition of "employable" that turned on a person's physical and mental fitness. (See *People v. Superior Court (Zamudio)* (2000) 23 Cal.4th 183, 199 [96 Cal.Rptr.2d 463, 999 P.2d 686] [Legislature not presumed to overthrow long-established principles of law unless intention is clearly expressed or necessarily implied].)

Watkins is mistaken in his reliance on *Mooney*. First and foremost, section 17001.5(a)(4) now explicitly authorizes a time limitation on benefits received by "employable" GA recipients. No such authorization existed at the time the Supreme Court decided *Mooney*.

Furthermore, the *Mooney* decision did not address the "proper" definition of "employable." The point of the discussion in *Mooney* is that, under the law as it then existed, a person otherwise eligible for GA could not be denied benefits simply because he was considered "employable," no matter how that term was defined. San Mateo County attempted to justify its reliance on a person's employability by contending it was authorized to consider an applicant's "economic resources" in establishing standards of aid. The court rejected the attempt to classify a person's "employability" as an economic resource, pointing out that the county's definition "merely [indicated] that a man is physically and mentally fit for work; it does not signify that a job awaits him." (*Mooney, supra,* 4 Cal.3d at pp. 679–680, fn. omitted.) The court went on to state: "Even in time of full employment a person may be physically and mentally fit, but lack necessary skills to obtain a job; in periods, such as the present, of substantial unemployment, even the skilled and experienced worker may be unable to obtain work. To the man who cannot obtain employment his theoretical employability is a barren resource; it is inedible; it provides neither shelter nor any other necessity of life. Until he can get a job, he does not differ in *economic resources* from the man whose unemployment stems from more personal disabilities. [Citation.]" (*Id.* at p. 680, italics added, fn. omitted.)

Viewed in context, *Mooney* merely addresses whether a person's employability, however defined, may be viewed as an economic resource. The court did not adopt or propose a particular definition of the term, other than to suggest that an applicant's employability is an economic resource only if it signifies that a job awaits him. (*Mooney, supra,* 4 Cal.3d at p. 680.) Plainly, *Mooney* cannot be read to imply that a person is "employable" only if a job exists and is offered to that person. Yet, that result is what Watkins's reliance on *Mooney* logically suggests. Simply put, the analysis in *Mooney* does not address the proper scope of the term "employable" when it appears in a statute expressly authorizing a limitation on GA benefits.

## IV.

### *Conclusion*

 We conclude the county's regulations imposing a time limitation upon the receipt of GA benefits by recipients deemed "employable" are consistent and not in conflict with section 17001.5(a)(4), the statute that authorizes the limitation. A definition of "employable" that turns upon a person's physical or mental fitness to work is consistent with the plain meaning and common usage of the term. The legislative history does not suggest the Legislature rejected this common meaning of the term in favor of a much more restrictive connotation that focuses on so-called practical employability factors, such as education, job skills, literacy, or job market conditions. Rather, the legislative history indicates the Legislature enacted section 17001.5(a)(4) to give counties an additional option to reduce GA costs. The Legislature understood that the limitation it authorized would result in the periodic discontinuation of GA benefits for persons who would otherwise qualify for this program of last resort, and it was aware that some individuals would suffer hardship as a result. Whatever we may think of this outcome, or of the wisdom of the legislation that permits it, it is not for us to rewrite the law to avoid consequences well within the Legislature's contemplation when it chose to allow the limitation authorized by section 17001.5(a)(4).

#### Disposition

The judgment is reversed.[26] The case is remanded to the trial court with directions to enter a judgment denying the petition for a writ of mandate. Each party shall bear its own costs on appeal.

Jenkins, J., concurred.

**POLLAK, J.,** Dissenting.—As set out in the majority opinion, the County of Alameda and its agents and agencies (collectively, the county) have appealed a writ of mandate issued at the behest of several residents of Alameda County who are recipients of general assistance (GA). The writ directs the county to discontinue the time limitation of GA benefits to otherwise qualified persons who are unemployable for reasons other than physical, mental or emotional incapacity, or their age. The appeal questions the meaning of an "employable individual" as that term is used in Welfare and Institutions Code[1] section 17001.5, subdivision (a)(4). In my view, the trial court correctly determined

---

[26] We deny Watkins's motion to strike portions of the county's reply brief.

[1] All statutory references are to the Welfare and Institutions Code unless otherwise indicated.

that "employable" is not synonymous with "able-bodied and mentally competent" and that the term must be construed "fairly and equitably based upon practical employability factors." In upholding the county's artificial definition of employability, defensible only as a means of reducing the county's welfare costs, the majority approves a definition that is at odds with the entire scheme of GA and with innumerable decisions of the courts of this state. While section 17001.5 authorizes counties to place certain restrictions on GA benefits, these restrictions are themselves limited. As part of a series of provisions designed to force welfare recipients to engage in job training and to seek employment, subdivision (a)(4) permits counties to impose time limits on GA benefits to persons who are "employable." The statute does not authorize counties to withhold relief from persons who, despite their best efforts, cannot obtain employment, by the simple expedient of calling "employable" people who no employer will employ.

At a time of widespread unemployment throughout the nation and California and Alameda County in particular,[2] the majority permits the county to terminate the last vestige of relief to thousands of indigents who cannot find work and have no other source of sustenance. This decision is unsupported by any indication that the Legislature intended such a draconian consequence, and is unnecessary to accomplish the Legislature's objective of compelling GA recipients to seek employment. In numerous prior situations in which counties have attempted to avoid their mandatory duty to provide aid for their indigent and dependent poor because of fiscal concerns, our Supreme Court has concluded that these "burdens were not so grievous as to permit indigents, in the midst of plenty, to go hungry, cold and naked, without fault." (*City and County of San Francisco v. Superior Court* (1976) 57 Cal.App.3d 44, 47 [128 Cal.Rptr. 712].) There is no reason for this court to do so now.

*Background*

In November 2007, the Alameda County Social Services Agency amended its GA regulations to provide that, effective January 1, 2008, "all GA applicants and recipients determined to be employable will be limited to a total of six months of assistance as an employable within any 12 month

---

[2] According to data released by California's Employment Development Department (EDD), unemployment in Alameda County rose from 6.5 percent, or 50,500 persons, in July 2008 (EDD Rep. 400 C (Mar. 5; 2009)) to 11.5 percent, or 90,000 persons, in July 2009. (EDD News Release No. 09-53 (Aug. 21, 2009) p. 4 [preliminary figures].) Unemployment in California rose from 7.3 percent in July 2008 to 11.9 percent in July 2009, a loss of between 760,200 and 798,000 jobs. (EDD News Release No. 09-53, *supra*, p. 1.) Nationwide unemployment in July 2009 was 9.4 percent of the workforce. (*Ibid.*)

period." (Alameda County General Assistance Regs., § 9-2-5.)[3] "Unemployable clients are not subject to time limits." (Regs., § 9-2-5.212.) The regulation defines unemployable applicants or recipients as persons meeting one of three conditions, in essence that they have a physical, mental or emotional incapacity, either permanent or temporary, that prevents them from working, or that they are 64 years of age or older.[4] The regulations were adopted by the agency pursuant to authority conferred by the Alameda County Board of Supervisors, as reflected in the Alameda County General Ordinance Code (ACGO).[5]

On June 6, 2008, prior to the termination of GA benefits to a large number of recipients that would have occurred under these regulations starting on July 1,[6] respondents filed a petition for a writ of mandate. The cause of action relevant to this appeal asserts that the county's classification of persons who are employable is overbroad and contrary to several provisions of the Welfare and Institutions Code. The petition alleges, "Section 11000 mandates that the provisions of law pertaining to the GA program, including section 17001.5(a)(4) authorizing time limits only for an 'employable individual,' be 'fairly and equitably' construed to effectuate the objectives and purposes of the GA program. A fair and equitable construction of 'employable individual' is that the individual be actually, not theoretically, employable and that, in determining employability, such factors as the individual's education, skill level, work history, advanced age, and opportunity to obtain employment in the relevant labor market, be considered by the [a]gency."

---

[3] All further regulation references are to the Alameda County General Assistance Regulations.

[4] Regulation 9-2-5.211 provides: "Unemployable applicants or recipients are determined to meet one or more of the following conditions: [¶] a. Have a physical, mental or emotional incapacity that prevents the person from working for 12 months or longer; this includes former SSI Drug & Alcohol persons who meet this criteria. [¶] b. Have a temporary physical, mental or emotional incapacity that prevents the person from working for a specified time period, which is less than 12 months. The period of incapacity does not include short term illnesses such as colds, flu, etc. that result in being unemployable for less than one calendar month. [¶] c. They are 64 years of age or older."

[5] ACGO section 7.08.060 provides that the agency shall administer an "employability program" under which, among other things, "[o]therwise eligible employable recipients become ineligible to receive general assistance after receiving three months of benefits within any twelve (12) month period," "a determination of unemployability shall be based on a written medical report as required by the agency," and an employable recipient is defined as "a recipient who does not have a medical statement of unemployability on file with the agency." (§ 7.08.060.A., F., B., G.) The statement of unemployability form used by the county (form 90-2) designates two categories of employable persons, those subject to no work restrictions and those subject to some work restrictions.

[6] The record indicates that the county had designated 6,462, or more than 75 percent of its 8,510 GA recipients, as employable.

The trial court ultimately issued a thoughtful statement of decision in which it concluded that the county's method of classifying GA recipients as employable constitutes an abuse of discretion. According to the trial court: "[The county] claim[s] the prerogative to define 'employable' as synonymous with 'able-bodied and mentally competent.' It is undisputed that, in assessing employability for purposes of the time limits, [the county does] not consider such factors as education, lack of skills and experience, illiteracy, or language barriers. The principles in *Mooney* [*v. Pickett* (1971) 4 Cal.3d 669 [94 Cal.Rptr. 279, 483 P.2d 1231]], *Hunt* [*v. Superior Court* (1999) 21 Cal.4th 984 [90 Cal.Rptr.2d 236, 987 P.2d 705]], *Alford* [*v. County of San Diego* (2007) 151 Cal.App.4th 16 [59 Cal.Rptr.3d 596]] and others in this line of cases all dictate that the [county] may not merely substitute for 'employability' a wholly different concept like 'able-bodied and mentally competent,' because to do so excludes people who are not employable by virtue of their lack of skills, lack of experience, lack of language fluency, age or other factors. (Cf. *Mooney, supra,* 4 Cal.3d at pp. 679–680.) By so doing, [the county has] abused [its] discretion." The court issued a writ of mandate, directing the county "to comply with [its] duty to construe the term 'employability' or 'employable individual' in Welfare and Institutions Code Section 17001.5(a) fairly and equitably based upon practical employability factors, as required by the state's interest in providing General Assistance benefits to indigents."

*Alameda County's Expansive Definition of "Employable" Distorts and Defeats the Intention of the Legislature*

"Section 17000 imposes upon counties a mandatory duty to 'relieve and support all incompetent, poor, indigent persons, and those incapacitated by age, disease, or accident,' when those persons are not relieved and supported by some other means.[7] [Citation.] In the last several decades many specialized relief programs have been enacted to support indigent individuals, but section 17000 'creates "the *residual* fund" to sustain indigents "who cannot qualify . . . under any specialized aid programs." [Citations.]' [Citation.] . . . [¶] Section 17001 requires each county to 'adopt standards of aid and care for the indigent and dependent poor.'[8] Although this provision confers upon a county broad discretion to determine eligibility for—and the types of—indigent relief, this discretion must be exercised in a manner that is consistent

---

[7] "Section 17000 states: 'Every county and every city and county shall relieve and support all incompetent, poor, indigent persons, and those incapacitated by age, disease, or accident, lawfully resident therein, when such persons are not supported and relieved by their relatives or friends, by their own means, or by state hospitals or other state or private institutions.' "

[8] "Section 17001 states: 'The board of supervisors of each county, or the agency authorized by county charter, shall adopt standards of aid and care for the indigent and dependent poor of the county or city and county.' "

with—and that furthers the objectives of—state statutes. [Citations.] These objectives are 'to provide for protection, care, and assistance to the people of the state in need thereof, . . . to promote the welfare and happiness of all of the people of the state by providing appropriate aid and services to all of its needy and distressed,' and to administer such aid and services 'promptly and humanely.' [Citation.] Furthermore, '[t]he provisions of law relating to a public assistance program shall be fairly and equitably construed to effect the stated objects and purposes of the program.' [Citation.] 'County standards that fail to carry out section 17000's objectives "are void and no protestations that they are merely an exercise of administrative discretion can sanctify them." [Citation.] Courts, which have " 'final responsibility for the interpretation of the law,' " must strike them down. [Citation.] Indeed, despite the counties' statutory discretion, "courts have consistently invalidated . . . county welfare regulations that fail to meet statutory requirements." ' " (*Hunt v. Superior Court, supra*, 21 Cal.4th at pp. 991–992 (*Hunt*); see also, e.g., *Alford v. County of San Diego, supra*, 151 Cal.App.4th at pp. 28–29 (*Alford*); *Arenas v. San Diego County Bd. of Supervisors* (2001) 93 Cal.App.4th 210, 215 [112 Cal.Rptr.2d 845]; *Nelson v. Board of Supervisors* (1987) 190 Cal.App.3d 25, 29–30 [235 Cal.Rptr. 305].)

Although " 'case law . . . has recognized that section 17001 confers broad discretion upon the counties in performing their statutory duty to provide general assistance benefits to needy residents[,] . . .' . . . there are 'clear-cut limits' to this discretion. [Citation.] The counties may exercise their discretion 'only within fixed boundaries. In administering General Assistance relief the county acts as an agent of the state. [Citation.] When a statute confers upon a state agency the authority to adopt regulations to implement, interpret, make specific or otherwise carry out its provisions, the agency's regulations must be consistent, not in conflict with the statute, and reasonably necessary to effectuate its purpose.' " (*County of San Diego v. State of California* (1997) 15 Cal.4th 68, 100 [61 Cal.Rptr.2d 134, 931 P.2d 312], citation omitted; see *Alford, supra*, 151 Cal.App.4th at p. 29; *Nelson v. Board of Supervisors, supra*, 190 Cal.App.3d at pp. 29–30.)

Section 17001.5, subdivision (a) provides authorization for counties to place various restrictions on the amount of and conditions for GA that it provides. The section begins, "Notwithstanding any other provision of law, including, but not limited to, Section 17000.5, the board of supervisors of each county, or the agency authorized by the county charter, may do any of the following . . . ." In subdivision (a)(4) the statute authorizes the county to "[p]rohibit an employable individual from receiving aid under this part for more than three months in any 12-month period, whether or not the months are consecutive. This paragraph shall apply to aid received on or after the

effective date of this paragraph. This paragraph shall apply only to those individuals who have been offered an opportunity to attend job skills or job training sessions." The county implicitly acknowledges that the time limitation it has imposed on GA benefits contravenes state law unless the limitation is authorized by subdivision (a)(4). (See *Mooney v. Pickett, supra,* 4 Cal.3d 669 (*Mooney*).)

The county argues that section 17001.5, subdivision (a)(4) authorizes the time limitation it has imposed because section 17001.5 states explicitly that its provisions apply "[n]otwithstanding any other provision of law." The county devotes the greater portion of its briefs on appeal to its argument that "the plain language of the phrase 'notwithstanding any other provision of law' means what it says" and the majority seems to attach some weight to this argument. However, the county's extended argument misses the point. Neither respondents nor the trial court (nor I) question that if section 17001.5, subdivision (a)(4) does in fact authorize the time limitation on those persons who the county considers to be employable, the restriction would be valid despite any more general provisions of the Welfare and Institutions Code to the contrary. The controversy concerns whether subdivision (a)(4) does in fact authorize such a limitation, which in turn depends on the meaning to be ascribed to the term "employable" as it appears in that provision.

The county defends its interpretation of "employable," which as correctly characterized by the trial court essentially equates the term with "able-bodied and mentally competent,"[9] by reference to the dictionary. In its appellate brief, it states that "[d]uring oral argument [in the trial court], the county presented a definition of 'employable' found in the oft-cited Webster's New World Collegiate Dictionary: 'physically or mentally fit to be hired for work.' " Respondents point out that this definition is incomplete. The complete definition in the fourth edition of Webster's New World Dict. (4th college ed. 2001) is "that can be employed; specif., a) physically or mentally fit to be hired for work b) meeting the minimum requirements for a specified position of work or position of employment."[10] Webster's New Collegiate Dictionary (1979) defines the term simply as "capable of being employed," as does the more recent Merriam-Webster's Collegiate Dictionary (11th ed. 2003). From these various dictionary definitions, one can conclude at most that the term is reasonably susceptible to more than one interpretation. One linguistically acceptable use of the term may be to refer to persons

---

[9] The only qualification to this characterization is that the county regulation also classifies as unemployable all persons 64 years of age or older.

[10] What is missing from the county's partial quotation of this dictionary definition is not only the second specific example of the use of the word, but the critical basic definition of the term: "that can be employed."

who are physically and mentally capable of performing work. Another equally acceptable use of the term is to refer to persons who are not simply able-bodied but who in fact employers are willing to employ. (See, e.g., Mumford, The Condition of Man (1944) p. 209 ["[T]he artist, who was the most courted figure of the fifteenth century, became ultimately the chronic unemployable of the nineteenth century."]; Gallagher et al., State General Assistance Programs 1998 (Urban Inst. 1999) p. 25 ["Persons with disabilities, elderly persons, *and other unemployable persons* are the most likely to be eligible for General Assistance." (italics added)].) In this sense, a healthy individual who speaks only a foreign language and has no job skills may not be employable, especially during periods of economic downturn and reduced employment.[11]

Recognizing that the term "employable" is linguistically susceptible to the interpretation that the county has given it does not end the inquiry, despite the discretion that the county exercises in administering the welfare statutes. The question is not what interpretation the language will bear, but what meaning was intended by the Legislature. That is a question that ultimately must be determined by the courts. (*Whitcomb Hotel, Inc. v. California Employment Com.* (1944) 24 Cal.2d 753, 757 [151 P.2d 233].) In *County of San Diego v. State of California, supra,* 15 Cal.4th at pages 100–104, for example, the Supreme Court refused to accept a definition of "indigent persons" that limited those entitled to GA benefits more strictly than contemplated by the statutory scheme. The Supreme Court explicitly disapproved of a Court of Appeal statement "that a county's responsibility under section 17000 extends only to indigents as defined by the county's board of supervisors." (*Id.* at p. 101, fn. 23; see *Alford, supra,* 151 Cal.App.4th at pp. 33–34.) For the same reason, the fact that other counties may have adopted a similar definition of employable individuals subject to time limitations on their receipt of GA benefits is not determinative of what the Legislature has intended.[12] "Again and again our courts have voided county ordinances which have attempted to redefine eligibility standards set by state

[11] See, e.g., Harvey, *Combating Joblessness: An Analysis of the Principal Strategies that Have Influenced the Development of American Employment and Social Welfare Law During the 20th Century* (2000) 21 Berkeley J. Emp. & Lab. L. 677, 709, footnote 112 (Harvey) ("[T]he line employers draw between 'employable' and 'unemployable' candidates varies depending on how many positions they need to fill relative to the available supply of labor. At the top of the business cycle and in geographic areas where aggregate demand is above average, employers find a larger portion of the labor force 'employable' as compared to other points in the business cycle and in geographic areas where aggregate demand is less robust. This is not surprising. When employers collectively need more workers, they lower their standards (and maybe give up some irrational biases) in order to hire the workers they need.").

[12] The county brought to the court's attention GA regulations adopted in several other counties. Although some of these regulations are superficially comparable to the Alameda County regulations, none appear to be as extreme. The regulations adopted in Los Angeles County, for example, classify as unemployable not only individuals who are unemployable

statute." (*Washington v. Board of Supervisors* (1993) 18 Cal.App.4th 981, 985 [22 Cal.Rptr.2d 852]; cf. *Rojas v. Woods* (1981) 127 Cal.App.3d 286, 290 [179 Cal.Rptr. 420] [invalidating State Department of Social Services regulation that disqualified AFDC (Aid for Dependent Children) applicants from receiving benefits for 30 days if they left employment without good cause; the department "had no power to impose a mode of pressure [to obtain employment] that the Legislature had not elected to adopt"].)

There are numerous reasons to conclude that "employable individual[s]" as used in section 17001.5, subdivision (a)(4) was not intended by the Legislature to refer to able-bodied persons who are unable to obtain employment— because they lack the necessary skills, language ability or other qualifications deemed necessary by employers for employment or simply because economic conditions are such that there is no employment available. Excluding such persons from coverage would be at odds with the entire scheme and purpose of the GA statutes. As the courts have repeatedly pointed out, GA "is a program of last resort." (E.g., *County of San Diego v. State of California, supra*, 15 Cal.4th at p. 92.) Section 17000 creates a "residual fund" to sustain indigents who have no other means of support and cannot qualify for benefits under any other specialized aid program. Limiting the right to more than three or six months of GA to those who are unable to work because of physical or mental incapacity limits that right to persons most likely to be entitled to welfare benefits under other federal and state programs (see, e.g., 42

---

because of a physical incapacity or a mental disability, but those who are "[a]dministratively unemployable—individuals who are unemployed for reasons other than physical." (L.A. County Gen. Assistance Relief Regs., § 41-301.5.) "This means," the regulations further state, "there are reasons **other than physical or mental incapacity** which prevents the individual from finding, accepting or continuing existing employment." (*Id.*, § 41-201, original boldface.) These regulations then specify 13 different reasons for which a person may be deemed administratively unemployable, including being enrolled in a California Department of Rehabilitation training program, providing full-time care to an incapacitated family member when other arrangements cannot be made, providing necessary infant care, participation in a mandatory substance abuse recovery program when a court-ordered reunification plan for a child is in effect, and when the person is "determined administratively unemployable by the District Director/Deputy District Director." (*Id.*, § 41-202.) The regulations adopted in San Diego County include persons with limited English-speaking capability or literacy or limited job skills as able-bodied and thus presumptively employable, but provide further that "[t]hese persons may be eligible to receive extended aid if they have extenuating circumstances, have a verified course of action to address and/or correct the situation within a limited time, and are approved for a hardship waiver from time limits by the GR Program Manager." (San Diego County Gen. Relief Selected Employability Regs., § C-1(3).) In Placer County, recipients are not classified as employable if they are "[n]eeded in home or to care for a child or children age 3 and under when no other child care arrangements can be arranged." (Resolution: Gen. Relief Program of Placer County, § 5(A)(1)(c).) In Mono County, the determination of employability is based upon either a job assessment and/or a mental health status evaluation. (Mono County Code, § 7.50.130(E).) In all events, whatever the situation may be in other counties, much less in other states under different statutes, the issue remains one for final determination by the courts.

U.S.C. § 1381 et seq. [Supplemental Security Income for Aged, Blind, and Disabled]; Welf. & Inst. Code, § 12000 et seq. [State Supplementary Program for Aged, Blind and Disabled]), and thus to persons who are not entitled to GA in the first place. (*Hunt, supra,* 21 Cal.4th at p. 991 ["section 17000 'creates "the *residual* fund" to sustain indigents "who cannot qualify . . . under any specialized aid programs" ' "].) However, if despite all diligent efforts a physically fit indigent person cannot obtain employment, deeming the person employable and limiting or denying GA on that basis is contrary to the fundamental purpose of providing GA to those who have no other source of relief.

The incongruence of the county's interpretation and the fundamental purpose of the statute is brought into sharp contrast by the decision in *Mooney.* There, prior to the enactment of section 17001.5, San Mateo County attempted to limit GA benefits pursuant to section 17000 by adopting the so-called "employable single man" rule, under which nonemergency GA benefits were denied to employable single men. (*Mooney, supra,* 4 Cal.3d at pp. 671, 672–673.) "The term 'employability' . . . [was] used by the county to denote merely that a man is physically and mentally fit for work; it [did] not signify that a job awaits him." (*Id.* at pp. 679–680.) In voiding the county's regulation the Supreme Court observed: "Even in time of full employment a person may be physically and mentally fit, but lack necessary skills to obtain a job; in periods, such as the present, of substantial unemployment, even the skilled and experienced worker may be unable to obtain work. To the man who cannot obtain employment his theoretical employability is a barren resource; it is inedible; it provides neither shelter nor any other necessity of life. Until he can get a job, he does not differ in economic resources from the man whose unemployment stems from more personal disabilities." (*Id.* at p. 680.) In enacting subdivision (a)(4) of section 17001.5, there is no reason to believe that the Legislature intended to embrace a definition of employability so forcefully discredited by the Supreme Court in the oft-cited *Mooney* opinion. (See, e.g., *People v. Superior Court (Zamudio)* (2000) 23 Cal.4th 183, 199 [96 Cal.Rptr.2d 463, 999 P.2d 686] ["We do not presume that the Legislature intends, when it enacts a statute, to overthrow long-established principles of law unless such intention is clearly expressed or necessarily implied."]; see also, e.g., *Ohio Casualty Ins. Group v. Superior Court* (1994) 30 Cal.App.4th 444, 449 [35 Cal.Rptr.2d 771].)

Nor is there reason to believe the Legislature intended to use the term "employable" in a sense that so far departs from its common understanding in the marketplace. According to the declaration of former Secretary of Labor Robert B. Reich, which is included in the record, the phrase "able bodied and mentally competent" is "typically used to describe a person without serious

physical impairments or mental/psychological disorders such as a developmental disability or mental illness. It is used to evaluate whether a person is capable of performing the functions necessary to daily living, not whether the person is capable of getting employment. A person who is 'able bodied and mentally competent' is not necessarily 'employable' because he or she may not be capable of becoming employed. In my view, 'employable' means that a person can reasonably compete for employment in the local labor market. Physical and/or mental disabilities are, of course, relevant but they do not alone determine whether a person is 'employable' in this practical sense. [¶] . . . [I]n a weak job market, persons with disabilities, few job skills and no employment history are not likely to be capable of obtaining jobs. Hence, they are not, practically speaking, 'employable.' "

This understanding is confirmed throughout the record. (E.g., declaration of Dr. Gerald Belchick, a vocational expert who commonly testifies before the Social Security Administration ["Various factors must be considered in evaluating employability. These factors include physical and mental disabilities and limitations, but also include age, education, work experience, or lack thereof, and literacy."].) It is also confirmed in the literature. (E.g., Holzer, What Employers Want: Job Prospects for Less-Educated Workers (1996) pp. 62–66, p. 132 ["for the least-skilled, least-educated, and least-experienced members of our society there appear to be a very limited number of jobs available in the short term"].) The Dictionary of Business Terms, published online by AllBusiness.com, defines "unemployable" as "those who are not employable because of their lack of skills, education, and experience." (<http://www.allbusiness.com/glossaries/unemployable/4944054-1.html> [as of Sept. 3, 2009].)

Another generally recognized category of individuals who cannot obtain employment is persons who are providing necessary childcare or daily home care for disabled relatives and have no other means of providing such care to those who are dependent upon them. (See, e.g., Goldberg & Collins, Washington's New Poor Law: Welfare "reform" and the roads not taken, 1935 to the present (2001) pp. 247–249; Maynard, *Subsidized Employment and Non-Labor Market Alternatives for Welfare Recipients* in The Work Alternative: Welfare Reform and the Realities of the Job Market (Nightingale & Haveman edits., 1995) pp. 113, 119–120; see also L.A. County Gen. Assistance Relief Regs., § 41-202(b), (e).) Had the Legislature intended to authorize a new limitation on GA to such persons, one can only assume that the Legislature would have made such an intention clear. (Cf., e.g., *Franzosi v. Santa Monica Community College Dist.* (2004) 118 Cal.App.4th 442, 450 [13 Cal.Rptr.3d 25] ["Looking to the whole system of law related to employees in the Education Code, we find the Legislature

knows how to specify the 'date of the approval of the disability allowance' when it desires to designate that date."]; *De Anza Santa Cruz Mobile Estates Homeowners Assn. v. De Anza Santa Cruz Mobile Estates* (2001) 94 Cal.App.4th 890, 911 [114 Cal.Rptr.2d 708] ["one can infer that the Legislature, if it intends a stated remedy to be nonexclusive or cumulative, knows how to express such a concept, and its silence on the subject therefore indicates a contrary intent"].) There is nothing in the history leading to the adoption of section 17001.5 or any of its subdivisions to justify the assumption that the Legislature intended to permit counties, by deeming such caretakers "employable," to limit to three months of the year essential relief to indigents who cannot accept employment because of their need to care for others.

There are other indications that the Legislature did not intend to equate "employability" with being able-bodied and mentally competent. Prior to the enactment of subdivision (a)(4) of section 17001.5, former subdivision (a)(3) authorized counties to discontinue GA benefits for up to 180 days to "able-bodied and mentally competent" recipients failing without good cause to participate in a qualified job training program or failing to engage in certain other conduct that might affect their ability to obtain employment. (Stats. 1992, ch. 719, § 14, p. 3330.) At the same time that the Legislature added subdivision (a)(4) to the statute, it amended subdivision (a)(3) by replacing the phrase "able-bodied and mentally competent" with the word "employable." (Stats. 1996, ch. 6, § 9, p. 29.) The clear inference is that the Legislature did not consider the terms to be synonymous, and that by an "employable individual" something other than able-bodied and mentally competent was intended. This inference is confirmed by the Department of Finance Enrolled Bill Report on the proposed amendments contained in Senate Bill No. 681 (1995–1996 Reg. Sess.), which states, "This bill would alter the criterion of 'able-bodie[d] and mentally competent' by changing it to 'employ[able].' Counties believe the current criteria are too restrictive and that it is difficult to get many recipients into job training."[13] Yet, the county has now interpreted "employable" to be the equivalent of the very language for which this qualifier was substituted when the Legislature amended the statute.

Amicus curiae, the California State Association of Counties, argues that by expanding the scope of those to whom section 17001.5, subdivision (a)(3) applies, the Legislature restricted the population entitled to non-time-limited GA cash benefits, presumably indicating that subdivision (a)(4) should also

---

[13] The report includes what apparently are two typographical errors. The report refers to "able-bodies" rather than "able-bodied" and to "employment" rather than "employable." The corrected terms are the terms that appeared in the former statute ("able-bodied") and in the amended statute ("employable").

be interpreted in a manner to achieve such a restriction. However, the modification that was made to subdivision (a)(3) reflects the acknowledgement that the ability to obtain employment is not determined exclusively by one's physical and mental health. In some cases a person with physical or mental disabilities may be employable, and in other cases a person without such disabilities may nonetheless be unable to obtain employment.

Amicus curiae also argues that various amendments made to the GA statutes in 1991, 1992, and 1996, including the addition of subdivision (a)(4) to section 17001.5, were all intended to reduce assistance costs to the counties in recognition of "the fiscal tightrope that counties must walk in order to meet the general mandate to provide Section 17000 aid while also providing other vital county services." We are told "the Legislature focused on protection, at the expense of the indigent population, of both its coffers and the coffers of local government." While the Legislature may indeed have authorized various reductions and restrictions because of fiscal pressures, the resulting statutory provisions are not to be interpreted simply with the aim of minimizing the financial burden on the counties. The statute still mandates that its provisions "be fairly and equitably construed to effect the stated objects and purposes of the [GA] program." (§ 11000; see *Hunt, supra,* 21 Cal.4th at pp. 1005–1006; *Alford, supra,* 151 Cal.App.4th at pp. 27–29; *Oberlander v. County of Contra Costa* (1992) 11 Cal.App.4th 535, 538–539, 543–545 [15 Cal.Rptr.2d 182].)

The amendments made to the GA statutes during the 1990's to which amicus curiae refers, described more fully in the majority opinion (at pp. 332–335, *ante*), authorize counties to impose various conditions and restrictions on GA benefits that had not previously been authorized. These measures were designed to permit counties to structure their programs to reduce GA expenditures and to encourage greater efforts by those on welfare to seek employment, consistent with the nationwide attempt at the time to move unemployed persons from "welfare to work." (See generally Harvey, *supra,* 21 Berkeley J. Emp. & Lab. L., pp. 687–689 & fn. 21, 747, fn. 221; Quigley, *Backwards into the Future: How Welfare Changes in the Millennium Resemble English Poor Law of the Middle Ages* (1998) 9 Stan. L. & Pol'y Rev. 101, 104 ["Like the earliest English Poor Laws, forcing poor people to work is the core theme of the 1996 welfare changes."]; Wilson, When Work Disappears: The World of the New Urban Poor (1996) pp. 164, 168; Burtless, *Employment Prospects of Welfare Recipients* in The Work Alternative: Welfare Reform and the Realities of the Job Market (Nightingale & Haveman edits., 1995) pp. 73–75.) However, these restrictions were defined and limited; none permit counties to abandon their responsibility to provide minimal assistance to indigents who, despite their best efforts, are unable to obtain employment.

Section 17000.5, enacted in 1991, permits counties to include the value of in-kind aid, including a portion of the actuarial value of medical care, in establishing their GA standard of aid. However, the statute establishes a firm minimum standard. Moreover, when an appellate court held that a county could satisfy its obligation under section 17000 to furnish health care to indigent residents by merely providing the GA standard of aid specified in section 17000.5, this view was quickly repudiated by both the Supreme Court and the Legislature, the Supreme Court emphasizing the continuing vitality of "the objectives of the statutory scheme governing indigent relief—to provide for the protection, care, and assistance of all the needy and distressed people of the state, and to administer appropriate aid and services promptly and humanely. (§ 10000.)" (*Hunt, supra*, 21 Cal.4th at pp. 1005–1006, italics omitted.)[14]

Section 17001.5 authorizes several other restrictions that counties are authorized to adopt, but none without limitations. Subdivision (a)(1) permits counties to adopt residency requirements for the purpose of determining eligibility for GA, but the requirement "shall not exceed 15 days" and may not exclude homeless persons by requiring recipients to "have an address." Subdivision (a)(2), as it now reads, again permits counties to establish special GA standards for those who share housing with unrelated persons. The subdivision prescribes limits on the amount by which benefits may be reduced to such persons (§ 17001.5, subd. (a)(2)(A)); in *Oberlander*, after again acknowledging the continuing obligation of the counties to provide GA to the indigent (*Oberlander v. County of Contra Costa, supra*, 11 Cal.App.4th at pp. 538–539), the court invalidated a county's attempt to reduce the benefits to persons sharing housing to less than authorized by the statute. (*Id.* at pp. 543–545.)

Similarly, section 17001.5, subdivision (a)(4), the focus of the inquiry in this case, permits counties to limit GA benefits to three months in any 12-month period, but only with respect to employable individuals. As indicated by the explicit qualification in this subdivision that before a county may terminate benefits it must offer applicants the opportunity to attend job skills or job training sessions, the time limitation is intended to incentivize individuals to take the steps necessary to seek and obtain employment. GA may be discontinued if a physically fit individual fails to accept reasonable employment or fails to participate in a job training program. (E.g., § 17001.5,

---

[14] The Legislature, for its part, promptly enacted section 17000.51 to correct the appellate court's misinterpretation of its intent and to clarify that, despite the potential cost savings, "a county's discretion granted pursuant to Section 17000.5 . . . was not intended, and shall not be construed, to . . . [among other things] [¶] . . . [s]atisfy, in whole or in part, the duty of a county . . . to provide health care services to indigent and dependent poor persons under Section 17000." (§ 17000.51, subd. (a)(1), as added by Stats. 1997, ch. 294, § 84.)

subd. (a)(3), (5).)[15] The statutory purpose of encouraging diligent efforts to obtain employment is accomplished by enforcing these conditions, not by adopting the fiction that people who simply cannot get a job are nonetheless necessarily "employable."[16] Nowhere in the language or history of this provision is there a suggestion that persons who, despite their best efforts, are unable to obtain employment can nonetheless be deemed "employable" and denied minimal, last-resort, GA subsistence benefits for nine months of the year. Interpreting "an employable individual" as used in section 17001.5, subdivision (a)(4) in a manner that corresponds with workplace reality would not, as the majority asserts, read subdivision (a)(4) out of the statute; rather, it

---

[15] It is within the counties' broad discretion to impose job training or work-related requirements on recipients that are classified as unemployable by virtue of circumstances unrelated to their physical or mental health. (See *Pettye v. City and County of San Francisco* (2004) 118 Cal.App.4th 233, 238 [12 Cal.Rptr.3d 798] [§ 17001 confers upon counties a broad discretion " ' "to determine . . . conditions to be attached to indigent relief" ' "]; § 17001; § 17200 ["Work may be required of an indigent, who is eligible to receive benefits under Section 17000, and who is not incapacitated by reason of age, disease, or accident, as a condition of relief."].) Subdivision (a)(3) of section 17001.5 authorizes a county to sanction an "employable" recipient who, among other things, fails without good cause to participate in a required job training program or accept an offer of employment, but subdivision (a)(5) of section 17001.5 is broader and, "[n]otwithstanding paragraph (3)," authorizes a county to "discontinue aid to, or sanction, recipients for failure or refusal without good cause to follow program requirements." Collectively, these subdivisions were enacted for the purpose of allowing "counties to discontinue aid for those recipients who refuse to participate in job training or accept an offer of employment." (Dept. of Finance, Enrolled Bill Rep. on Assem. Bill No. 1012 (1991–1992 Reg. Sess.) Aug. 19, 1992, p. 2.) Although subdivision (a)(3) of section 17001.5 implies that job training and employment requirements will most often be imposed on "employable" recipients, subdivision (a)(5) nonetheless provides a mechanism for enforcing such requirements with respect to all physically fit recipients, whether employable or unemployable. Thus, the county's limited and unrealistic construction of those who are unemployable is not necessary, as the majority asserts (at pp. 341–343, *ante*), to avoid the undesirable consequence of eliminating job training requirements for able-bodied persons who are unemployable because they lack English proficiency, job skills or other employment prerequisites.

[16] Although respondents in this litigation have not attempted to show that the job skills and training sessions provided by Alameda County are insufficient to justify the imposition of time limits under section 17001.5, subdivision (a)(4), the record contains suggestions that these programs may be woefully inadequate. Improved general educational and job training programs, as well as programs designed to provide such support as childcare, will tend to reduce joblessness and dependence on welfare. (See, e.g., Goldberg & Collins, Washington's New Poor Law: Welfare "reform" and the roads not taken, 1935 to the present, *supra*, at pp. 243–249; Holzer, What Employers Want: Job Prospects for Less-Educated Workers, *supra*, at pp. 45–70; Burtless, *Employment Prospects of Welfare Recipients* in The Work Alternative: Welfare Reform and the Realities of the Job Market, *supra*, at pp. 94–102.) The point for present purposes is that in order to achieve the legislative objectives, emphasis should be placed on providing improved training programs and job-seeking assistance and insisting that unemployed GA recipients utilize those services, rather than by defining the problem away by deeming persons who cannot obtain work nonetheless "employable."

is the county's artificial definition of "employable" that eviscerates the meaning of this statutory qualification as it relates to an untold number of individuals.

The county's expansive interpretation of "employable" is not the means the Legislature has provided for a county to obtain relief if the GA obligations become greater than the county's finances can bear. Rather, section 17000.6, first enacted in 1993 (Stats. 1993, ch. 72, § 1, p. 1059) and reenacted as part of the same legislation by which subdivision (a)(4) was added to section 17001.5 (Stats. 1996, ch. 6, §§ 8, 9, pp. 28, 29), permits a county to reduce the level of aid if the Commission on State Mandates makes a finding that meeting the standards in section 17000.5 would result in significant financial distress to the county. (§ 17000.6, subd. (a).) The availability of this escape mechanism emphasizes that defining the conditions of eligibility in a manner that does not comport with the basic purpose and structure of the GA program is not the means the Legislature intended to address whatever financial strain the mandate of sections 17000 and 17000.5 may place upon the county. (See *Washington v. Board of Supervisors, supra*, 18 Cal.App.4th at p. 986 [a county in financial extremes "may not meet its financial burdens by redefining state standards of eligibility"].)

The writ of mandate that the trial court issued here correctly recognizes the overbreadth of the manner in which the county has defined those whose GA benefits may be time limited because they are "employable individual[s]." (§ 17001.5, subd. (a)(4).) The writ does not improperly invade the province of the county. It would leave to local authorities the task of revising the governing regulations to comply with the statute, by delineating those who are unemployable in a manner that recognizes factors in addition to physical and mental capacity that may render an otherwise eligible person unable to obtain employment despite his or her best efforts to do so.[17] By permitting the county to ignore the myriad of additional factors that may render a person incapable of obtaining employment, the majority sanctions what can only be characterized as throwing out the baby with the bath water. While section 17001.5, subdivision (a)(4) permits the county to time limit relief to persons

---

[17] As indicated above (see fn. 12, *ante*), other counties have chosen diverse methods of defining those who are employable for the purpose of applying a time limit to GA benefits. Moreover, the record also reflects employability guides that have been adopted in California and in other jurisdictions to determine entitlement to benefits under the federal Temporary Assistance for Needy Families program, implemented in California as the CalWORKs program. (§ 11200 et seq.) According to the Director of Policy for the Alameda County Social Services Agency, the assessment criteria for this purpose include the participant's work history, skills, knowledge and abilities, educational history and educational competency level, need for supportive services, as well as "an evaluation of the participant's chances to get a job given his/her skills and the local job market." The trial court's order would leave to the county the discretion to draw from these or other sources in fashioning appropriate criteria of employability.

who are employable, it does not permit the county to deny relief for up to nine months of the year to indigent persons who no one in the marketplace is willing to employ. I would affirm the judgment of the trial court.

Respondents' petition for review by the Supreme Court was denied December 2, 2009, S177058. Moreno, J., was of the opinion that the petition should be granted.